John W. McCREARY and
ALD, Inc., Plaintiffs,

and

John W. McCreary, as Special Administrator of the Estate of Norman Bryan McCreary, Deceased, Intervenor–Plaintiff,

v.

The UNITED STATES, Defendant.

No. 576–87 C.

United States Court of Federal Claims.

April 19, 1996.

Randall J. Forbes, Frieden, Haynes & Forbes, Topeka, KS, for plaintiffs. John C. Frieden and Kevin M. Fowler, Frieden, Haynes & Forbes, Topeka, KS, and D.A.N. Chase, Chase & Yakimo, Overland Park, KS, of counsel.

Robert F. Altherr, Jr., Special Attorney to the United States Attorney General, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. Thomas J. Byrnes and Edward H. Rice, Department of Justice, Washington, D.C., of counsel.

## OPINION

SMITH, Chief Judge.

Norman McCreary created a unique invention for solving the problem of supporting a solid vehicle or platform with an air cushion at a relatively reasonable power (or fuel)

consumption level. The common terms for such vehicles are "hovercraft" or "ground effect vehicles." The McCreary invention was a flexible double-walled skirt, attached to the underside of the vehicle or platform, that would deform when it encountered obstacles and stay relatively close to the ground or water surface. It would thus retain enough of the air cushion for reasonable energy usage, while allowing the vehicle or platform to clear relatively rough water or ground.

However, Norman McCreary's invention differs in significant respects from that used in the accused vehicles in that it relied on a relatively low pressure, flexible, hollow, double-walled curtain or skirt to achieve its purpose. The accused craft rely on a significantly different, and apparently more practical, approach. Their invention is a relatively high pressure, firm bag, that does not deform easily. The bottom of the bag is several feet from the ground or water surface. Internal air pressure and their geometry, not the Venturi effect, keeps the bags in position, containing the upper portion of the air cushion. The government vehicles combine this bag with single-walled finger skirts, which are open to the air cushion, and not held down by the Venturi effect, but by the outward pressure of the air cushion and their geometry. These fingers, a separate invention, contain the lower portion of the air cushion so that levitation can be maintained without undue energy consumption.

While the McCreary invention and the government's vehicles (as well as third party devices) all deal with the same general problem (containing the air cushion at a reason-

able energy cost), they do it in different ways. While the McCreary invention and the government vehicles are branches off the same part of the tree trunk, they are distinct branches. In all the voluminous material the court has reviewed, there is really no hint that the McCreary invention contemplated or encompassed the relatively rigid, heavy inner tube-like structures the three government craft use. Rather, the genius of the McCreary invention is a flexible, and seemingly necessarily (by its physics), circular skirt with only enough air pressure to stay inflated when no obstacle is encountered. Its ability to deflate and slip or conform around obstacles is one of its inherent strengths and its very inventiveness over the prior art. To use a very imprecise analogy, a cork and a balloon both effectively float on the water, but they achieve this result in different ways. The fact that the government vehicles also obtain some benefits similar to those outlined for the McCreary invention does not mean that the government's vehicles infringe the McCreary patent. They are based upon different inventions.

In this "patent infringement" suit, plaintiffs, John W. McCreary, ALD, Inc., an Oklahoma corporation, and John W. McCreary, as Special Administrator of the Estate of Norman Bryan McCreary, (hereinafter "the Estate") seek reasonable and entire compensation from the United States for the unlicensed and unauthorized use and/or manufacture of the invention(s) described in U.S. Patent 3,532,179, titled "Aerodynamic Lifting Device and Method of Lifting" (hereinafter "the '179 or McCreary patent"). The court has jurisdiction under 28 U.S.C. § 1498(a).[1]

---

1. § 1498(a) provides in pertinent part:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

For purposes of this section, the use or manufacture of an invention ... by a contractor [or] subcontractor, ... with the authorization or consent of the Government, shall be con-

strued as use or manufacture for the United States.

28 U.S.C. § 1498(a) (1988 & Supp. V 1993). *See also Hughes Aircraft Co. v. United States,* 209 Ct.Cl. 446, 534 F.2d 889, 897–98 (1976).

Because a suit under § 1498(a) is analogous to a patent infringement action between private parties, *see* Discussion, part B, *infra,* the terms "patent infringement" and "unauthorized use of a patented invention" are used synonymously throughout this opinion. Strictly speaking, however, patent infringement is actionable between private parties pursuant to 35 U.S.C. § 281. On the other hand, so-called "patent infringement" by the United States is an uncompensated taking of private property under the Fifth Amendment.

United States Patent 3,532,179 was issued on October 6, 1970, to Norman McCreary, the inventor, now deceased. The inventions claimed therein relate to hovercraft or, more generally, devices which hover above a ground surface on a cushion of pressurized air. Plaintiffs in this matter are: (i) the inventor's son and heir, John McCreary; (ii) John McCreary's assignee, ALD; and (iii) the Estate, as an intervenor-plaintiff. These plaintiffs complain that the McCreary patent was infringed, i.e., was used or manufactured without license or authorization by or for defendant, the United States, see 28 U.S.C. § 1498(a), when the government (specifically, the U.S. Army and Navy) procured and thereafter operated certain amphibious landing craft containing or employing Norman McCreary's patented inventions.

A six-week trial was held on the merits in this case, and the court later heard oral argument on the parties' post-trial briefs. After careful, lengthy, and deliberate consideration of the evidence and testimony presented at trial, the parties' briefs, and the oral arguments thereon, the court concludes that: (1) the Estate is not barred by the statute of limitations, 28 U.S.C. § 2501 & 35 U.S.C. § 286, from seeking reasonable and entire compensation for the alleged unauthorized use of the McCreary patent; and (2) plaintiffs have failed to carry their burden of proving by a preponderance of the evidence that defendant has infringed the McCreary patent, either literally or under the doctrine of equivalents.

The court begins with a recitation of the relevant facts in the instant case. Next, the court examines whether the Estate is barred by the applicable statute of limitations from seeking relief in this court. Because the court holds that the Estate is entitled to the benefit of the tolling provision at 35 U.S.C. § 286, the court finds that the claim of the Estate was timely filed. Finally, the court turns its focus to whether the McCreary patent has been infringed by any of the defendant's amphibious landing craft. Upon a full review of the relevant evidence, and in light of plaintiff's burden of proof, the court holds that none of the accused vehicles infringe the '179 patent. Thus, none of the three plaintiffs before the court is entitled to any compensation from the United States government under 28 U.S.C. § 1498(a). Accordingly, judgment shall be entered for defendant.

## FACTS

### I. *THE INVENTION*

In 1957, Norman McCreary developed an invention addressing problems inherent in "hovercraft" or "ground effect vehicles," [2] i.e., vehicles which float on a cushion of pressurized air. Specifically, the air cushion of a hovercraft must be surrounded and contained beneath the vehicle in order to minimize power or energy requirements. For, if the vehicle can "hug" the ground closely, more lift can be achieved with less volume of air lost and, therefore, less power consumed. Irregular terrain and obstacles make it difficult, however, for a hovercraft to hug the ground closely. From the inception of the concept, designers of these devices, have sought to increase hovercraft ground clearance while continuing to contain the pressurized air cushion beneath the vehicle.

In response to this dilemma, Norman McCreary developed a double-walled, flexible curtain or skirt, which hung from the periphery of the vehicle's rigid deck or platform. This curtain was designed to surround and contain the air cushion upon which the vehicle floated or hovered. Unlike the means utilized in other hovercraft designs of the time to contain the air cushion, McCreary's curtain was pliant and yielding. As a result, his curtain could deflect back under the platform as it encountered an obstacle during travel and resume its perimetrical shape as the obstacle was passed. This allowed a device outfitted with or embodying McCreary's invention to more easily traverse

U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"); *Judin v. United States*, 27 Fed.Cl. 759, 773 (1993) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed.Cir.1984)).

2. These craft are sometimes also called "surface effect" vehicles to denote their ability to operate over water as well as land.

obstacles or irregular terrain than had previously been possible for vehicles of this type. *See* Appendix A.

Norman McCreary constructed his first prototype air cushion lifting device .in the spring of 1957. His prototype was made from cardboard and featured a double-walled polyethylene curtain to contain an air cushion beneath a rigid platform. His device could float on this air cushion, hovering slightly above the ground.

Shortly thereafter, McCreary constructed further models and prototypes and demonstrated his invention for neighbors, friends, and passers-by. He also allowed two local high school students to use his ideas. Norman McCreary procured a written statement from the students, which read:

> Permission is hereby granted to Lonnie Warren and William Wood to construct for their own personal use an air car based on the principles of my air-mobile. It is understood that they will not make this or any other models for sale.

[DX 74]. Both boys made their own operational hovering devices based upon information obtained from the inventor. At least one of the boys won a prize in a science fair for his device in March 1960.

In addition, in 1957, Norman McCreary had detailed discussions with Joseph Wyrick about the potential manufacture of larger versions of his device. Wyrick borrowed a working model for a few days and brought it to his home, during which time he and his two sons were able to examine it in detail. The two sons of Joseph Wyrick, who is now deceased, do not remember the presence of any express confidentiality agreement between their father and the inventor. [DX 166; DX 167].

II. *THE PRIOR AND CONTEMPORANEOUS ART*

Early experimenters in the field of ground effect vehicles had attempted· to achieve greater ground clearance beneath air cushion vehicles or hovercraft while minimizing the leakage of pressurized air from the air cushion. Typically, increased ground clearance resulted in increased leakage and a corresponding increase in energy required (*i.e.,* fuel consumed) to maintain the air cushion. As described above, Norman McCreary's invention involved surrounding the central air cushion with a peripheral, double-walled curtain or skirt to reduce air leakage. At about the same time that McCreary was experimenting with his peripheral skirt in 1957, an Englishman, Christopher Cockerell (later Sir Christopher Cockerell), was taking a slightly different approach to containing an air cushion beneath a vehicle: the peripheral or annular jet. [See DX 211; DX 212; DX 213; DX 215; PX 28 at 1]. According to Cockerell's designs, jets of high speed air directed downward from beneath the outer edge (*i.e.,* the perimeter) of the vehicle platform would create an air cushion to support the vehicle. Like McCreary's skirt, these air jets also served to contain the air cushion. The annular jet design evolved from vertical jets to jets that were angled inward. [PX 64 at 121, 122, 183, 304, & 323; *see also* PX 28 at 2].

In 1959, a British firm, Saunders Roe, Ltd., used Cockerell's peripheral jet design to build the SR.N1, an early hovercraft. Later that year, the SR.N1 completed, with considerable difficulty, a crossing of the English Channel. On that journey, and in general, the SR.N1 had tended to flounder in waves higher than the 12–14 inch height of its air cushion. Saunders Roe thereafter began to experiment with the recirculation of air as a method to conserve the energy of the air jets. Continuing experiments in 1960 and 1961 ultimately led Saunders Roe to develop a single-walled and, subsequently, a double-walled skirt to contain the air cushion—a solution similar to that developed by Norman McCreary in Arkansas in 1957.

An article in the June 1960 issue of *Science and Mechanics* described work on hovercraft here and abroad including projects by Bell Helicopter Corp., the United States Army, Princeton University, and Norman McCreary. The article referred to the ground-clearance problems inherent in such vehicles and the attempts by some researchers to solve those problems using curtains or skirts. A photograph of McCreary with an eight-foot long, operational prototype appeared in the article. [PX 67 at 73–77].

The concept of supporting a vehicle or device upon an air cushion and even of surrounding the air cushion with a skirt or curtain had been well-known prior to McCreary's invention. For example, the 1909 Worthington patent (U.S. Patent 936,-395) described an air cushion support for a street car and used a flexible skirt to seal the air cushion at the front and rear of a car. [DX 191]. In addition, Cristadoro, in 1943, obtained a U.S. Patent (No. 2,322,790) for a marine air cushion vessel with a yielding, inflated bow which, combined with side rails and a stern section, surrounded a supporting air cushion. [DX 186]. Likewise, the 1956 Seck patent (U.S. Patent 2,743,787) disclosed a vacuum cleaner supported by an air cushion surrounded by a rigid double-walled skirt. [DX 193].

Cristadoro's design provided for longitudinal rails dividing his air cushion into separate chambers. [DX 186, p. 2, ln 55]. Another multiple-chamber air cushion device was developed by a Frenchman, Bertin, in the early 1960's. Bertin's design showed a platform supported by multiple air cushions, each surrounded by a cylindrical skirt. [DX 181; DX 182]. Finally, two more U.S. patents were primarily directed to supporting cargo above a flat surface. Vaughen (U.S. Patent 3,055,-446), a 1962 patent, described a rectangular device having multiple rectangular "plenum" or air cushion chambers within. [DX 192]. And, lastly, the 1963 Jay patent (U.S. Patent 3,097,718) described a triangular platform supported by three metal disks, each housing a separate air cushion. [DX 198].

## III. THE '179 OR McCREARY PATENT

### A. Prosecution History

U.S. Patent 3,532,179, the McCreary patent, is the culmination of a series of four patent applications filed in the Patent and Trademark Office (PTO). Norman McCreary filed an initial application with serial number 14,732 on March 14, 1960; application number 20,799 was filed on April 5, 1960; and application number 72,348 was filed on November 29, 1960. The final application, serial number 471,489, was filed on June 1, 1965 and was eventually granted as U.S. Patent 3,532,179 on October 6, 1970. [DX 174; DX 175; DX 176; DX 177].

### 1. First Application

Norman McCreary's first patent application, for a "Toy, and so Forth," was filed on March 14, 1960. [DX 174]. That first application, serial number 14,782, was abandoned in April 1960 with the submission of his second application entitled "Lifting Device and Method." [DX 174 at 51].

### 2. Second Application

The second application was assigned serial number 20,799. The complete set of drawings from the first application was transferred to the second. [DX 175 at 1]. In response to the second application, the patent examiner required McCreary to elect five species or embodiments of his invention. [DX 175 at 83, 85]. Each embodiment is depicted by a drawing or group of drawings showing an example of the invention. The election of species requirement is a practical expedient which facilitates the examination process by reducing the number of embodiments (concrete examples of the inventive concept) being evaluated by the examiner. Cf. Henriksen v. Cory Corp., 327 F.2d 409, 411 n. 2 (7th Cir.1964) (discussing Patent Office Rule 41). McCreary elected five species as represented by the following five groups of drawings in his second application:

| | | |
|---|---|---|
| Species (a) | Figures | 1–4 |
| Species (b) | Figures | 11–17 |
| Species (c) | Figures | 21–24 |
| Species (d) | Figure | 26 |
| Species (e) | Figures | 30, 31 |

[DX 175 at 90]. Specifically excluded from the embodiments to be prosecuted were figures 27, 27A, and 29. See Appendix B. These drawings, taken together, depict an inner curtain wall sealed to the vehicle's platform. Instead of the curtain being filled with air from the main air cushion, the peripheral air space between the curtain walls was supplied with air by independent fans. Holes in the inner wall of this embodiment allowed air to pass from the peripheral air space into the main air cushion. [DX 175 at 49–51, 80–81].

In a second response on June 15, 1961 [DX 175 at 94, 96], the examiner rejected McCreary's claim 1 (which eventually became claim 3 in the '179 patent) as unpatentable

over Worthington [DX 191], Nicin [DX 196], or *Aviation Week* [DX 204], all prior art references which disclose a single-walled curtain, or over Seck [DX 193] which describes a vacuum cleaner riding on an air cushion contained by a double-walled curtain. The examiner rejected this claim as anticipated by this cited prior art (*i.e.*, the art known prior to McCreary's invention). *See* 35 U.S.C. § 101. Furthermore, claims 7 and 12 of the second application were rejected by the examiner as unpatentable over Seck in view of the January 12, 1959, *Aviation Week* article featuring a vehicle supported by an air cushion surrounded by a flexible skirt.

Seeking to overcome the examiner's prior art objections, McCreary noted, in the remarks attached to his responsive amendment, that his claim 1, eventually claim 3 of the '179 patent, defines a "*flexible*, hollow, columnar, double-walled curtain." He suggested that the flexibility of his curtain distinguished claim 1 from Worthington, Nicin, Seck, and Aviation Week. [DX 175 at 108]. McCreary went on to describe his invention's "venturi effect," the tendency of rushing air beneath the lower edge of the curtain to cause a downward pull on the lower edge of the curtain as the air escapes to the surrounding atmosphere. He observed that this feature is absent in Worthington, Nicin, and Aviation Week. [DX 175 at 108–09]. Moreover, McCreary noted that the V-shape of Worthington, was not "columnar" and that Worthington lacks a "completely cylindraceous curtain." [DX 175 at 110, 130].

Not long thereafter, McCreary demonstrated his invention using a model at an interview with the patent examiner. [DX 175 at 128]. According to McCreary's subsequent correspondence with the examiner (*i.e.*, amendments with accompanying remarks) the examiner agreed (or at least Norman McCreary vigorously contended) that the use of the Venturi effect in McCreary's invention was novel. [DX 175 at 129; *see also* DX 175 at 109]. Norman McCreary also emphasized in those remarks that air in the annular cavity, between the walls of the hollow skirt, is supplied from the core or main air cushion, and is common to the air in the air cushion. [DX 175 at 108, 110, 114]. Finally,

McCreary further distinguished his invention from the prior art cited by the examiner by pointing out the ability of his peripheral skirt to yield as it passed over obstacles, noting that the solid walls of Seck could not traverse obstacles. [DX 175 at 110, 129; *see also* DX 175 at 128–29].

In his final rejection of Norman McCreary's second application the examiner found that claims 1, 7, and 10 of that application (claims 3, 6, and 7 in the '179 patent) were misleading. [DX 175 at 155–59]. The examiner therefore required that McCreary clarify these claims by specifying that the inner wall of his double-walled curtain had to be spaced from the platform. The examiner also cited Gaska (U.S. Patent 3,177,959) [DX 200] and Cockerell (U.S. Patent 3,182,739) [DX 202] as relevant prior art, finding that McCreary's "flexible, hollow, columnar curtain" was anticipated by Gaska, Cockerell, and Seck.

### 3. *Third Application*

Norman McCreary submitted a third patent application (serial number 72,348) on November 29, 1960, entitled "Aerodynamic Lifting Device and Method of Lifting." [DX 176]. Again, the examiner required the election of five species. This time, McCreary elected five different groups of drawings:

| | | |
|---|---|---|
| Species (a) | Figures | 34–36, 46, 47 |
| Species (b) | Figures | 1–4, with or without Figures 7 & 8 at the option of the Examiner. |
| Species (c) | Figures | 11–18 |
| Species (d) | Figure | 49 |
| Species (e) | Figures | 50–54 |

[DX 176 at 126].

This third application was intended to cover vehicles or devices having a plurality of curtain units as distinct from the co-pending second application which was directed to a single curtain unit. [DX 176 at 131]. The examiner found the claims of this third application unpatentable over the following prior art: Beardsley [DX 187], Vaughen [DX 192], Hurley [DX 197], Hovercraft [DX 206, 207], *Aviation Week* [DX 206], and *Science and Mechanics* [DX 209]. Specifically, the examiner stated that the prior art already taught the principle of "lifting a body by a plurality of curtains to the underside thereof." [DX

176 at 134]. McCreary's response, an amendment with remarks in May, 1963, questioned the suitability of most references cited by the examiner as postdating the April 5, 1960, filing date of his earlier application. [DX 176 at 137–38]. Having narrowed the cited references to Vaughen, McCreary distinguished his invention from this prior art with an emphasis on the *"laterally spaced apart curtains* each of which has a *substantially straight vertical columnar* wall" described in claims 81 and 83 of his third application. [DX 176 at 138–39]. Norman McCreary also distinguished Vaughen based on the fact that in his invention, unlike this prior art, "the pressure [sic] air is deliberately discharged under the lower edges of the curtains and is then allowed to dissipate into the atmosphere between the spaced apart curtains." [DX 176 at 139].

In his September 3, 1964, response to McCreary's amendment, the examiner added Jay [DX 198] to his list of prior art citations. [DX 176 at 143]. In his final rejection of the third application, the examiner maintained that Jay's " 'laterally spaced' devices" and Vaughen's "laterally spaced apart curtains" anticipated McCreary's plurality of curtain units. [DX 176 at 145].

### 4. *Fourth Application*

McCreary submitted a fourth patent application under the same title as his third application, "Aerodynamic Lifting Device and Method of Lifting." [DX 177]. This fourth application, filed in June 1965, was given serial number 471,489. McCreary transferred his drawings, numbered 1–54, from his third application to this fourth and final application. [DX 177 at 118]. In an initial office action regarding this final application [DX 177 at 119], the examiner rejected claims 2, 5, and 6 as misleading because those claims failed to specify a space between the curtain's inner wall and the platform, the same reason he gave for rejecting the corresponding claims 1, 7, and 10 in McCreary's second application. [DX 177 at 119; *see* DX 175 at 157]. These claims appear as claims 3, 6, and 7 in the '179 patent. An interview with the patent examiner took place on February 4, 1966. [DX 177 at 166].

In accordance with requests made by the examiner at the February 4 interview, McCreary submitted an amendment on May 25, 1966. [DX 177 at 146]. In this May 25 amendment, McCreary inserted, in claims 2, 5, and 6, the words "—and sealed at least at its outer upper edge to [said platform]." [DX 177 at 145, 162, 163]. Those claims (claims 2, 5, and 6 of the fourth application) ultimately became claims 3, 6, and 7 of the '179 patent. According to plaintiffs, this "at least" language left open the possibility that both the inner and outer walls of a double-walled skirt based on the McCreary invention, could be sealed to the vehicle platform, as is the case in the government's vehicles.

On the same day, McCreary transferred drawings, numbered 1–33, from his second application to this fourth application and abandoned the second application. [DX 177 at 145]. Among the transferred drawings were figures 27, 27A, and 29, which collectively depict the *inner wall sealed* to the vehicle platform. These figures were not, however, included in the election of species made in December 1960. [DX 175 at 90]. In remarks appended to this May 25, 1966, amendment, McCreary referred to figures 27 and 29, explaining to the examiner that he had intended configurations both with and without the inner wall sealed to the supporting platform. [DX 177 at 169]. Continuing his remarks, McCreary distinguished his invention from the prior art, observing that the cited prior art disclosed curtains that were relatively rigid and that were held down only by gravity, rather than by air pressure as in McCreary's invention. [DX 177 at 170].

About a month later, another interview was held, on June 20, 1966, to discuss McCreary's May 25 amendment adding the words "at least" to claims 2, 5, and 6 (claims 3, 6, and 6 in the '179 patent). [DX 177 at 186]. In a supplemental amendment dated June 22, 1966, in accordance with an agreement reached at the June 20 interview, McCreary altered those words to read "—and sealed at its outer upper edge to [said platform]," eliminating the words "at least." [DX 177 at 186, 183, 184]. As is discussed in

detail below, the parties dispute the significance of this amendment.

In addition, a more detailed description of the operation of the Venturi effect was added to claim 20 in this June 22 amendment. Claim 20 had referred to downward pulling means without a functional explanation of how that downward pull was achieved. The examiner had therefore called for clarification. [DX 177 at 184, 186]. This new language in the amendment explained how the Venturi effect was achieved, specifically referring in this regard to the "discharge of air from said air cushion[ ] through the narrow space below said lower edge[ ] at a lower super-atmospheric pressure than the pressure of said [air cushion]." [DX 177 at 184].

During the prosecution of McCreary's final patent application, two interference proceedings were decided in his favor. An interference proceeding is initiated when two applications in the PTO appear to claim the same invention. In this case, the Mackie and Bertin applications each claimed an invention similar to one of the claims in McCreary's fourth application. The Mackie interference involved the subject of McCreary's claim 1, while the Bertin interference related to McCreary's claim 19. Both claim 1 and claim 19 were introduced into the McCreary patent application as a result of these interference proceedings. Furthermore, both proceedings were resolved upon a determination that McCreary had reduced his invention to practice prior to these other parties. Based on these findings of priority, both the Mackie and the Bertin interference were resolved in McCreary's favor.

Following the resolution of the Bertin interference, the PTO issued a notice of allowance on April 10, 1970, and United States Patent 3,532,179 was issued to Norman McCreary on October 6, 1970.

### B. *The Patent Claims*

The '179 patent includes twenty-eight claims. Only claims 1, 3, 6, 7, 13, and 19 are at issue here. Claims 1, 3, 6, 7, and 13, although independent, involve common themes and are primarily addressed herein as a group. Stripped to their essentials, all of the McCreary claims at issue, except claim

19, describe a horizontal platform with a double-walled skirt hanging down from the outer edge to contain an air cushion within. An annular cavity or air space is formed between the double walls of the curtain in each of the patent claims. Each of these claims also includes, in so many words, a fan to pressurize the air cushion. The actual claim language includes technical subtleties which are omitted from this simple description. Yet, the simple elements of platform, skirt, and pressurized air cushion are not in dispute. Claim 19, on the other hand, describes a vehicle or device that is supported on multiple air cushions, which cushions are pressurized by a ducted fan arrangement. Unlike the other claims, claim 19 does not require a double-walled curtain surrounding these air cushions. The claims are set forth in their entirety in the "discussion" section *infra.*

### C. *Subsequent Assignments and Administrative Claims*

By 1976, Norman McCreary had become aware that Bell Aerospace had developed a hovercraft (the SES–100B) for the Navy. In a letter to Harold Macklin at Reynolds Metals Company dated March 5, 1976, McCreary referred Macklin to the August 1975 edition of *Marine Engineering/Log.* McCreary claimed that Macklin would see, if he looked at the magazine, that the SES–100B was "definitely using the Air-cushion features covered by our Patent." He reminded Macklin that "your company has the Exclusive Marine Rights to my Patent." [DX 115; DX 116].

However, despite this knowledge, Norman McCreary never made an administrative claim for compensation. Nor did he ever file a suit for patent infringement prior to his death on July 6, 1980. The '179 patent was not specifically bequeathed in Norman McCreary's will and, as a result, became part of the residuary of his estate. [DX 75]. Because the residuary was too small to be efficiently held in trust, the Arkansas probate court permitted a sale of the residuary to the inventor's son, John, for $750.00, on July 2, 1981. [DX 76; DX 90]. Pursuant to that sale, the '179 patent was transferred to

John McCreary by assignment recorded at the Patent and Trademark Office on September 8, 1981. [PX 15; DX 92]. The following year, John McCreary presented administrative claims to the U.S. Navy on November 15, 1982 [PX 59; DX 327] and to the U.S. Army on November 17, 1982. [PX 58]. No evidence in the record indicates that these administrative claims were ever formally denied. John McCreary subsequently assigned the '179 patent to ALD but reserved to himself all claims for infringement occurring during the period between his purchase of the '179 patent and his assignment of the patent to ALD on April 14, 1987. [PX 18, DX 91].

## IV. *THE ACCUSED VEHICLES*

Of an original list of eight accused vehicles, only three are still alleged to infringe the '179 patent. These are the LCAC (Landing Craft/Air Cushion), the LACV–30 (Lighter Air Cushion Vehicle, 30 ton), and the Jeff–B (U.S. Navy Amphibious Assault Landing Craft, Jeff–B), all produced by Bell Aerospace Textron, a division of Textron, Inc. *See* Appendices B–E. Claims with respect to the other five vehicles were dismissed on June 27 and December 21, 1990.

The three vehicles at issue here are extremely similar to one another in the significant aspects of their design and construction. As a consequence, throughout this opinion, these vessels are often considered as a group. While they may differ in size and in some outward appearances, the features which are alleged to infringe the '179 patent are for the most part the same. The accused craft are all large, amphibious cargo transport vessels. Their (the LCAC and LACV–30) military mission is to transport equipment for the Marines and/or the Army from ships at sea to the assault area or beachhead on shore. In contrast, the Jeff–B was merely a research and development vehicle and, therefore, had no operational military mission.

The Jeff–B is 80 feet long and 43 feet wide with a gross vehicle weight of 160 tons. Its maximum allowed speed is 50 knots, although it is capable of greater speeds. The design payload of the Jeff–B is 60 tons. [DX 28 at

10, PX 89 at 1–13; *see also* DX 15]. The LCAC is slightly over 87 feet long and 46 feet wide. [PX 32]. Like the Jeff–B, the LCAC has a maximum allowed speed of 50 knots. The unladen LCAC weighs 183,000 lbs. but can reach 327,000 lbs. with a full payload. [PX 34 at 1–3]. Finally, the thirty-ton payload LACV–30 is roughly 80 feet long and 36 feet wide. [DX 31 at 46].

The air cushions of these vehicles are partitioned and surrounded by inflated inner tube-like chambers called "bags" or "trunks." *See* Appendices I–L. Air is pumped into these trunks by "lift fans." [*See generally,* PX 29; PX 32]. On the LACV–30, for example, the lift fans are vertical axis, seven foot diameter, centrifugal fans mounted on both sides of the rear of the vessel. [DX 29 at 4–8, 4–14]. On the LCAC only, these same fans also pump additional air directly into the air cushion. [PX 29 at 4–14; PX 32 at 2–3]. Air that is pumped into the inflated trunks then passes through small feeder holes in the trunks into the air cushion where it helps to lift the vehicle from the ground surface. [PX 29 at 4–14; PX 32 at 2–3]. The air cushion is constantly venting to the surrounding atmosphere as air at superatmospheric pressure passes under a "finger skirt" attached to the bottom of the inflated trunks and surrounding the lower portion of the air cushion. This "finger skirt" consists of single-walled pockets—a scalloped membrane pushed outward by the pressure in the air cushion but also held back against the air cushion by individual "fingers" fastened to the underside of the trunks. The pressure in the inflated trunks of the LCAC and Jeff–B is approximately 138 pounds per square foot (PSF) while the pressure in the air cushion is about 100–104 PSF. [PX 34 at 1–9; *see also* DX 15 at 1–27]. On the LACV–30, a lighter vehicle, the pressures are lower but the ratio between the bag pressure and the air cushion pressure is approximately the same (*i.e.,* the bag pressure is about 140% of the air cushion pressure).

The LACV–30 and the Jeff–B have air cushions which are divided into four sections or compartments by longitudinal and transverse "stability seals." These stability seals are inflated trunks which partition the

air cushion beneath the vehicle. [PX 89 at 1–89]. Similarly, the LCAC air cushion is divided into three compartments. Its peripheral skirt, longitudinal partition, and two lateral partitions fit "quite closely together, effectively dividing the cushion into three compartments, forward, port aft, and starboard aft." [PX 32 at 2–1].

## V. PROCEDURAL HISTORY & CURRENT PROCEDURAL POSTURE

The instant suit was initially brought by John McCreary and ALD on September 16, 1987. Plaintiffs asserted, in their complaint, infringement of the '179 patent by eight air cushion vehicles manufactured by private industry for the United States military: the LCAC, the LACV–30, the SES–200, the BH–110, the SES 100 A and B, and the JEFF–A and B. In its answer of November 16, 1987, the government denied any infringement of the '179 patent.

On March 13, 1990, defendant filed the first of three motions for partial summary judgment. In this first motion, the government sought to prevent plaintiffs John McCreary and ALD from asserting claims for infringement occurring prior to July 2, 1981, the date on which John McCreary purchased the '179 patent from his father's estate. This first motion was eventually rendered moot when, as is explained below, the court allowed the Estate to intervene in an order dated February 5, 1992.

Subsequent to the filing of defendant's first partial summary judgment motion, the Estate of Norman McCreary was reopened and John was appointed Special Administrator for the purpose of pursuing the estate's claims against the government for unauthorized use or manufacture of the McCreary patent prior to July 2, 1981. [DX 323]. On March 27, 1991, John McCreary moved to intervene in this case as the Special Administrator of his father's estate. This motion to intervene was granted by the order of February 5, 1992, and, by the terms of that order, the filing date for the Estate's inter-

vention was to relate back to the date on which the plaintiffs' complaint was filed, September 16, 1987. The only claim on behalf of the inventor's estate is through John McCreary's intervention in his capacity as Special Administrator.

Defendant filed its second motion for partial summary judgment on May 16, 1990, seeking to bar plaintiff's claims for infringement by vessels designated SES–100A and SES–100B under 28 U.S.C. § 2501. This motion was rendered moot by the parties' June 27, 1990, stipulation to dismiss those claims with prejudice.

Next, defendant filed its third motion for partial summary judgment on November 21, 1990, asserting that prior public use renders claims 1–6, 8, 9, 11, 13, 15, and 26 of the McCreary patent invalid under 35 U.S.C. § 102(b). This motion was denied on February 5, 1992.

Lastly, in an order dated December 21, 1990, the Court dismissed with prejudice claims relating to government vessels designated BH–110, SES–200, and Jeff–A. As a result, the only accused vessels remaining before the court are the LCAC, the LACV–30 and the Jeff–B.

## DISCUSSION

### I. STATUTE OF LIMITATIONS (28 U.S.C. § 2501 & 35 U.S.C. § 286)

Four different parties have, at various times, held title to the McCreary patent: Norman McCreary; his Estate; Norman McCreary's son, John McCreary; and, John McCreary's assignee, ALD (in that order). Three of these parties, the Estate, John McCreary, and ALD are currently before the court. As an initial matter, we begin by addressing defendant's contention that any patent infringement claim by the Estate, for infringement occurring prior to July 2, 1981 (the date on which the patent was assigned by the Estate to John McCreary), is barred by the statute of limitations embodied in 28 U.S.C. § 2501 and 35 U.S.C. § 286.[3]

---

3. The court begins its analysis with this issue because statutes of limitations on actions against the United States are ordinarily jurisdictional. *Soriano v. United States*, 352 U.S. 270, 273, 77

S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957); *Mitchell v. United States*, 10 Cl.Ct. 63, 67 (1986). As such, this issue represents a threshold inquiry

The time limit for the filing of actions against the government for patent infringement under 28 U.S.C. § 1498 is delineated by two complementary statutory provisions. First, 28 U.S.C. § 2501 provides in pertinent part:

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed *within six years* after such claim first accrues.

28 U.S.C. § 2501 (Supp. V 1993) (emphasis added). Second, 35 U.S.C. § 286 dictates that:

Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint. . . .

In the case of claims against the United States Government for use of a patented invention, the period before bringing suit, up to six years, between the date of receipt of a written claim for compensation by the department or agency of the Government having authority to settle such claim, and the date of mailing by the Government of a notice to the claimant that his claim has been denied shall not be counted as part of the period referred to in the preceding paragraph.

35 U.S.C. § 286 (1988).

■ Thus, under these provisions, any claim for an alleged unauthorized use or manufacture of a patented invention that occurred more than six years prior to the filing of the complaint is time-barred unless a written administrative claim is filed with the appropriate agency or department. If such an administrative claim is filed, the six-year statute of limitations may be tolled for up to an additional six years. The tolling period under 35 U.S.C. § 286 is equal to the shorter of: (i) six years or (ii) the time between the receipt of the claim by the government and the mailing of a notice of denial of the claim by that agency or department. In addition,

the filing of a petition in this court will stop the tolling period. *See Dynamics Corp. v. United States*, 5 Cl.Ct. 591, 598 (1984) ("filing of a petition terminates the pending administrative claim. . . ."), *aff'd in part and rev'd in part*, 766 F.2d 518 (Fed.Cir.1985) (affirming on all issues except the use of simple rather than compound interest in calculating delay damages).

The initial complaint was filed in the instant case on September 16, 1987. Although the Estate later intervened as a plaintiff, this court held in its order dated February 5, 1992, that the filing date would relate back to the date of the initial complaint. Therefore, if no administrative claim had been filed, the Estate would only be permitted to recover for any infringing use that occurred on or after September 16, 1981 (six years before the filing of the complaint). Since the Estate is only entitled to pursue claims for infringement that occurred prior to July 2, 1981 (the date on which the patent was assigned by the Estate to John McCreary), defendant maintains that the entire claim of the Estate is barred by the six-year statute of limitations.

■ However, it is undisputed that John McCreary, through his counsel, presented administrative claims to the U.S. Army and U.S. Navy, each of which was received on or about November 22, 1982. Under 35 U.S.C. § 286, the running of the statutory period was, therefore, suspended from November 22, 1982, until September 16, 1987, the filing date of the complaint.[4] Thus, the law permits recovery from November 22, 1976, forward. In response, the government argues that the Estate cannot obtain the benefit of a tolling of the statute of limitations by an administrative claim filed solely by and on behalf of another (i.e., John McCreary). The court disagrees. Because the court finds that the administrative claims at issue properly served to toll the running of the statutory period as applied to the Estate, the court holds that the Estate's claim of patent infringement, pursuant to 28 U.S.C. § 1498, is

that the court must confront. *See* RCFC 12(h)(3).

**4.** The filing date of the complaint serves as the end point of the tolling period since it appears

from the record that these administrative claims were never denied by the respective departments prior to that date.

timely, and therefore not barred, with respect to any alleged unauthorized use or manufacture of the patented invention that occurred between November 22, 1976, and July 1, 1981, inclusive.

■ It is well-settled that the purpose of the tolling provision contained in 35 U.S.C. § 286 is to provide the government with notice of, and time to carefully consider, potential claims as well as to afford it the opportunity to possibly correct its mistakes, and, thereby, avoid costly litigation through settlement or otherwise. *Custer v. United States,* 224 Ct.Cl. 140, 622 F.2d 554, 558, 563, *cert. denied,* 449 U.S. 1010, 101 S.Ct. 565, 66 L.Ed.2d 468 (1980); *Fairchild Engine and Airplane Corp. v. United States,* 152 Ct.Cl. 352, 285 F.2d 131, 133 (1961); *Dow Chem. Co. v. United States,* 32 Fed.Cl. 11, 20 (1994); *Dynamics,* 5 Cl.Ct. at 598. In this connection, defendant relies on *Custer, supra,* in making its argument that John McCreary's administrative claims were ineffective to toll the statute of limitations with respect to the Estate.

In *Custer,* the inventor of a patented device assigned his entire right and interest in the patent to the plaintiff corporation. 662 F.2d at 557. On these facts, the Court of Claims held that an erroneously filed administrative claim by the inventor, "one [who was] not the lawful owner" of the patent, could not serve the purpose of the statute, namely to afford the government the opportunity to consider and settle potential claims. *Id.* at 563. Therefore, the court concluded that the plaintiff's period of recovery could not be extended under the tolling provision of 35 U.S.C. § 286. *Id.*

In the case at bar, it is uncontroverted that John McCreary, unlike the inventor in *Custer,* was the lawful owner of the McCreary patent when he presented his administrative claims to the Army and Navy in 1982. Furthermore, these written claims demanded an accounting for *all past infringement* of the McCreary patent. Therefore, the government was certainly put on notice of a potential claim for the alleged infringement on which the Estate now premises its suit. *Cf. MDS Assocs., Ltd. v. United States,* 31 Fed. Cl. 389, 395 (1994).

Moreover, these administrative claims afforded the government the opportunity to avoid litigation by settling potential claims with the lawful owner of the patent, John McCreary. Finally, because John McCreary was the son of Norman McCreary and the assignee of the Estate, these administrative claims also provided "the government a realistic opportunity to consider and settle [any] claim" that the Estate might have by getting in touch, through John McCreary, with the Estate's appropriate legal representative. *Dynamics,* 5 Cl.Ct. at 598.

Accordingly, the established purpose of the tolling provision in 35 U.S.C. § 286 was clearly served in the instant case. As a result, the statute of limitations was tolled for the Estate during the pendency of the administrative claims. Nothing in the language of § 286 compels a different outcome. Indeed, the focus of that provision is on the receipt of a written claim by the appropriate government department, rather than on the particular individual or entity that has a claim.[5] Thus, neither the statute of limitations nor the precedent in *Custer* bars the Estate's claim for patent infringement. Therefore, this court has jurisdiction to entertain the Estate's claim to the extent it seeks compensation for the unauthorized use or manufacture of the McCreary patent from November 22, 1976, through July 1, 1981.

## II. INFRINGEMENT—GENERAL PRINCIPLES

■ Having concluded that the Estate of Norman McCreary has properly invoked the court's jurisdiction, the court now must resolve the merits of this case with respect to

---

**5.** Section 286 provides that "[i]n the case of *claims* against the United States Government for use of *a patented invention* ..." the statute of limitations will be tolled upon the "receipt of *a written claim* for compensation by the department or agency ... having authority to settle such claim...." 35 U.S.C. § 286 (emphasis added). This language suggests that the limitations period may be tolled with respect to multiple claims for use by a department or agency of a single patented invention by the receipt of *a single written administrative claim* by that department or agency. This is precisely the case before the court.

all three plaintiffs. Plaintiffs, charge the United States with the unauthorized use or manufacture of Norman McCreary's patented invention under 28 U.S.C. § 1498(a).[6] A suit under § 1498(a) is analogous to a patent infringement action between private parties, and the same analysis is necessary whether the court is attempting to determine patent infringement by a private party or unauthorized use by the government pursuant to § 1498(a). *Lemelson v. United States,* 752 F.2d 1538, 1548 (Fed.Cir.1985) ("principles of claim construction and reading claims on accused devices and methods are the same for either type of action."); *Motorola, Inc. v. United States,* 729 F.2d 765, 768 (Fed.Cir. 1984). In any event, plaintiffs must prove patent infringement, or unauthorized use, by a preponderance of the evidence. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1582 (Fed.Cir.1988); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986); *Lemelson,* 752 F.2d at 1547; *Dow Chem. Co. v. United States,* 20 Cl.Ct. 623, 642 (1990).

■ The court's evaluation of an infringement suit has two stages: determining what invention is claimed in the patent (claim interpretation or construction) and, in a suit under 28 U.S.C. § 1498(a), determining whether the government used or manufactured the invention without authorization from the patent owner (infringement determination). *Lemelson,* 752 F.2d at 1551; *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir.1984); *Autogiro Co. v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 401 (1967).

■ Thus, the court must first determine the proper scope and meaning of the patent claims at issue as a matter of law. *Jurgens v. McKasy,* 927 F.2d 1552, 1560 (Fed.Cir.), *cert. denied* 502 U.S. 902, 112 S.Ct. 281, 116 L.Ed.2d 232 (1991); *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed,* 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991); *Hybritech, Inc. v. Abbott Labs.,* 849 F.2d 1446, 1455 (Fed.Cir.1988);

*Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 866 (Fed.Cir.1985). Next, as a finding of fact, the court must ascertain whether the claims, as properly interpreted, "read on" the accused device—that is, whether the accused device falls within the scope of the claimed invention. *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 986 (Fed.Cir. 1989); *Mannesmann,* 793 F.2d at 1282; *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985); *Envirotech,* 730 F.2d at 758 (noting that claim construction is a matter of law while reading the claims on the accused devices is a finding of fact).

A. *Claim Interpretation—Legal Principles*

■ The starting point of claim interpretation is the language of the claim itself. *See Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1580 (Fed. Cir.1991) ("construction of claims is simply a way of elaborating the normally terse *claim language* " (emphasis added)). The terms therein are to be given their ordinary meanings, unless it appears that the inventor used the words differently. *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 951 (Fed. Cir.1993). In this regard, the understanding of those skilled in the art is the proper vantage point from which to interpret the claim. *Id.; Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed.Cir.1992). Where the meaning of a particular word or phrase is ambiguous or disputed, reference may be had to the specification, the prosecution history, and the prior art, as well as to the other claims, in order to resolve the ambiguous or disputed meaning. *See SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1118 (Fed.Cir.1985). Accordingly, the court now turns to examine the language of the patent claims at issue before this court.

B. *Claim Language (claims 1, 3, 6, 7 & 13)*

The '179 patent includes twenty-eight claims, of which only claims 1, 3, 6, 7, 13, and 19 are at issue here. Claims 1, 3, 6, 7, and

---

6. Pursuant to § 1498(a), use or manufacture by a contractor or subcontractor for the government or with authorization or consent from the government is treated the same as if the government itself used or manufactured the patented invention. *See* note 1, *supra.*

13, although independent, involve common themes and are primarily addressed herein as a group. Claim 19, however, applies to ground effect vehicles that are supported on a plurality of air cushions as opposed to a single air cushion. Accordingly, claim 19 is addressed separately below after the other claims. The '179 patent claims at issue (except claim 19) read as follows:

1. A ground proximity fluid cushion supporting device comprising, a platform, a flexible diaphragm underlying said platform shaped to provide a perimetrical depending convolution, the periphery of said diaphragm being hermetically attached to said platform and the central portion thereof being restrained in a fixed position beneath said platform above the lower most extremity of said convolution thereby forming a plenum cavity between said diaphragm and the ground and an annular cavity between said diaphragm and said platform, means formed inboard of said convolution providing direct communication between said annular cavity and said plenum cavity, and means for introducing fluid under pressure directly into one of said cavities.

\* \* \* \* \* \*

3. A lifting device having in combination a plenum chamber formed by an upper horizontal panel and an enclosing side wall construction extending downwardly from said panel; a blower supported on said plenum chamber and having an air inlet connected with the surrounding atmosphere and connected to an air outlet which discharges air at superatmospheric pressure into said plenum chamber; and a flexible hollow columnar, double-walled curtain suspended at its upper edges from and sealed at its outer upper edge to said plenum chamber and restraining a portion of an air cushion at superatmospheric pressure formed under said panel, said curtain having two flexible walls spaced apart at the upper edges of said curtain and joined together at the lower edge of said curtain and restraining part of said air cushion between said flexible walls at relatively high air pressure and having its lower edge slightly spaced from a "ground" sur-

face under normal operation for restrained escape of air from said cushion between said lower edge of said curtain and said ground surface at relatively low air pressure to cause a downward pull on said air curtain.

\* \* \* \* \* \*

6. A combination to be supported slightly above a "ground" surface by an air cushion having a superatmospheric air pressure during normal operation comprising: a supporting member; air moving means having air intake means connected with the surrounding atmosphere and discharging air from said surrounding atmosphere at superatmospheric pressure into said air cushion; a flexible, hollow columnar double-wall curtain suspended at its upper edges from and sealed at its outer upper edge to said supporting member, surrounding at least the lower part of said air cushion, and having its lower edge slightly spaced from said "ground" surface during normal operation for restrained escape of air from said air cushion between said lower edge and said "ground" surface, said curtain having an outer wall joined at its lower edge to an inner wall which extends upwardly and inwardly from the lower edge of said outer wall into said air cushion to form a low velocity high pressure air body between said outer and inner walls and a high velocity low pressure air stream below said walls.

7. A combination to be supported slightly above a "ground" surface by an air cushion having a superatmospheric air pressure during normal operation comprising: a supporting member; air moving means supported by said supporting member and having air intake means connected with the surrounding atmosphere and discharging air from said surrounding atmosphere at superatmospheric pressure into said air cushion; a flexible, hollow columnar double-wall curtain suspended at its upper edges from and sealed at its outer upper edge to said supporting member, surrounding at least the lower part of said air cushion, and having its lower edge slightly spaced from said "ground" surface during normal operation for restrained es-

cape of air from said air cushion between said lower edge and said "ground" surface, and movable weight means to produce a controlling force in said combination.

\* \* \* \* \* \*

13. A lifting device comprising: a relatively rigid supporting member with a peripheral orbital support for a curtain; an orbital, flexible, channel shaped, sheet curtain with an outer edge secured to said peripheral orbital support and with an inner edge secured to a support inside the vertical bounds established by said peripheral orbital support and under said rigid supporting member, said curtain having an intermediate low periphery between said inner and outer edges of said curtain and there being a peripheral air space between said curtain edges, and there being a core air space inside said inner edge; said peripheral air space and said core air space being connected for interchange of air, and superatmospheric pressure air supply means to introduce superatmospheric air into an air cushion below said supporting member surrounded by said curtain to lift said supporting member with said intermediate low periphery of said curtain spaced slightly above a "ground" surface under said lifting device.

[DX 172, cols. 33–36].

### III. *ANALYSIS OF DISPUTES OVER CLAIM LANGUAGE*

#### A. *"Annular," "Columnar," and "Orbital" Curtains*

Having set forth the operative claim language from the '179 patent, as issued on October 6, 1970, the court is now in a position to interpret or construe the meaning of the relevant claims. The court begins by addressing the parties' competing contentions as to the proper interpretation of the words "annular" (claim 1), "columnar" (claims 3, 6 & 7), and "orbital" (claim 13). Defendant contends that the McCreary patent requires a curtain or skirt that is substantially circular in horizontal cross-section by virtue of these descriptive adjectives. Plaintiffs disagree.

#### 1. *"Annular" (claim 1)*

Claim 1 describes an air cushion device in which the air cushion is surrounded by a double-walled "flexible diaphragm" that forms an "annular cavity" between the twin walls of the diaphragm. [DX 172, col. 33, lns. 10 & 17]. The issue before the court is whether the use of the word "annular" in claim 1 requires a substantially circular diaphragm (*i.e.*, curtain or skirt). In general, "annular" means "forming a ring" or "shaped like a ring." Webster's Third New International Dictionary 88 (1986). Inasmuch as a ring is ordinarily circular in shape, the use of the word "annular" to describe the space between the curtain walls suggests that the curtain must be substantially circular in the horizontal plane.

However, while the court normally gives claim terms their ordinary meanings, the court is required to interpret those terms as they would have been understood by one skilled in the art to which the patented invention pertains unless it appears that the inventor used the terms differently. *Hoganas*, 9 F.3d at 951; *Intellicall*, 952 F.2d at 1387. At trial, several expert witnesses testified that the term "annular" had come to mean *peripheral* in the field of ground effect vehicles by the late 1950's.

First, John Chaplin, plaintiffs' witness, testified that the term annular had originally been used to describe jets that surrounded the perimeter of circular platforms on ground effect vehicles. The witness further testified that the term annular became popular among those working in the field of hovercraft design and engineering and, therefore, by the late 1950s, was in use to describe peripheral jets on various non-circular platforms. Mr. Chaplin was involved in the engineering, design, and testing of early hovercraft, including the SR.N1, from approximately 1957 onwards. Accordingly, his testimony demonstrates that the term annular was used and understood by those skilled in the art of hovercraft design as a synonym for peripheral at approximately the same time that Norman McCreary made his invention and filed his initial application for a U.S. patent.

In addition, defendant's witness, Wilfred Eggington, an engineer also very much involved in the early development of hovercraft and a former colleague of Mr. Chaplin, confirmed that, in the field of hovercraft development as of the late 1950s, the term annular was applied to jets that surrounded the perimeter of hovercraft platforms, regardless of the shape of the platform. And, finally, defendant's witness, Robert Miller, a patent law expert, admitted that, by 1959, those working in the field of hovercraft development came to use the term annular to mean various shapes not limited to circular. For example, Mr. Miller testified that the 1969 Cockerell patent (U.S. Patent No. 3,424,266), the application for which was filed in 1966, uses the term annular to describe an inflatable bag skirt attached to the periphery of the hovercraft platform. In that patent, the platform was depicted as "boat-shaped," *i.e.,* not circular. [Tr. 3768–73]. Therefore, the testimony at trial establishes that, by the late 1950s, the term annular was understood by those working in the field of ground effect vehicles to mean peripheral and was certainly not limited to circular forms.

A collection of 1959 symposium papers [PX 64] introduced at trial confirms this understanding. For example, one of these papers provides that an "annular or edge jet ... may be used all around the periphery of a platform." [PX 64 at 121–22]. Moreover, the SR.N1 initially had an "elliptical" shape with an "annular jet" around its perimeter. [PX 64 at 183; *see also* PX 64 at 304 & 307]. In addition, certain figures contain depictions of ground effect vehicles shaped like rectangles with semi-circular ends that have "annular" jets around their edges. [PX 64 at 83 & 323]. Thus, as of 1959, in the field of hovercraft development, the term "annular" had come to mean peripheral.

Therefore, in light of the understanding of those skilled in the art of hovercraft design, the court interprets the limitation that the curtain form an "annular cavity" to mean that the curtain must surround the perimeter of the platform and form a peripheral cavity around the main air cushion. Furthermore, this interpretation is supported by the Mackie prosecution history, which both parties

agree is a relevant reference in construing claim 1 since that claim originated in the Mackie application and was incorporated into the McCreary patent application pursuant to the interference with Mackie.

Claim 1 of the McCreary patent originated as claim 22 of the Mackie application. Furthermore, the term "annular cavity" that appears in claim 1 of the McCreary patent initially appeared in Mackie claim 22. Claim 22 of the Mackie application was intended to "present the broadest concept of the invention in better form." [DX 178 at 49–50]. In the initial application, Mackie, et al. describe one embodiment of the invention as having a platform that is "preferably rectangular." [DX 179 at 10]. This rectangular embodiment was also included in the Mackie patent as issued. [DX 180 at 4–5]. This demonstrates that Mackie et al. conceived that their "annular cavity" could be rectangular and was not limited to shapes that were strictly circular. The court must thus construe the term "annular cavity" as used in the McCreary patent to reflect that understanding.

Accordingly, in view of the understanding of those skilled in the art of ground effect vehicles as well as the relevant prosecution history, the court construes the term "annular," as used in claim 1, to mean peripheral. Claim 1 does not, therefore, contain a limitation that the curtain or diaphragm be substantially circular in horizontal cross-section by virtue of the use of the word "annular."

### 2. *"Columnar" (claims 3, 6 & 7)*

Claims 3, 6, and 7 each describe a air cushion device comprising a flexible, double-walled, "columnar" curtain. The term "columnar" means "having the form of a column." Webster's Third New International Dictionary 451 (1986). A column is, in turn, defined as "a pillar consisting of a shaft, a capital, and [usually] a base, the shaft being of circular section except as it is fluted or channeled." *Id.* More generally, a column is any "form, structure, or formation shaped like a column," *i.e.,* "a somewhat cylindrical upright body." *Id.* Clearly, then, the common understanding of the word "columnar" denotes a substantially cylindrical shape or form. None of the parties have argued that

one of skill in the art would ascribe anything other than the ordinary and accustomed meaning to that word.

Plaintiffs, however, contend that Norman McCreary intended to give the term "columnar" a different meaning from this general usage. They argue that Norman McCreary understood claims 3, 6, and 7 to encompass flexible, double-walled curtains of any shape or cross-section. Such an understanding is completely at odds with the common understanding of "columnar," which expressly refers to form and/or shape. While the inventor has some freedom to be his own lexicographer, that freedom is not entirely unconstrained. "Where an inventor chooses to be his own lexicographer and give terms uncommon meanings, he must set out his uncommon definition in some manner within the patent disclosure." *Intellicall,* 952 F.2d at 1388. Accordingly, the court must examine the patent disclosure (*i.e.,* the specification) to determine if McCreary set forth a definition of "columnar" other than its ordinary one.

Nowhere in the McCreary patent is the word "columnar" expressly defined. Plaintiffs point out that, nonetheless, Norman McCreary indicated in the specification that:

A flexible, hollow, columnar diaphragm curtain 54 may be an orbital, flexible, channel-shaped, sheet curtain which may be of any suitable horizontal cross-section, which, in this embodiment is orbital or circular.

[DX 172, col. 7, lns. 40–43]. Plaintiffs contend that this passage establishes that Norman McCreary intended his "columnar" curtain to be of any shape. However, this passage is inconclusive. If "columnar" is understood to mean "substantially cylindrical," then "any *suitable* horizontal cross-section" is one that is substantially circular. And, in the embodiment described, the cross-section is *exactly* circular. Thus, the cited language in the specification is not necessarily inconsistent with the ordinary meaning of the term "columnar."

Moreover, elsewhere in the specification, the term "columnar" is used synonymously with "cylindraceous" and "cylindrical." For example, at the outset of the specification, in his general explanation of his invention, Norman McCreary states:

This invention relates to a vehicle, craft, or glider which lifts itself from a "ground" surface by a cushion of air. . . . The air cushion is surrounded by a substantially air impervious *cylindraceous or columnar* side wall construction. . . .

[DX 172, col. 2, lns. 51–60 (emphasis added)]. Similarly, in describing one embodiment of the invention, Norman McCreary referred in the specification to the "*cylindrical or columnar* curtain wall*" of his hovercraft device. [DX 172, col. 11, ln. 18 (emphasis added)]. These examples demonstrate that the term "columnar" as used in the '179 patent means "substantially cylindrical."

The prosecution history also supports this understanding. First, during the prosecution of his second application, Norman McCreary distinguished his invention from the prior Worthington patent. The Worthington device required curtains that were "provided only at the ends." [DX 175 at 130]. McCreary argued that his invention was distinguishable over Worthington because the Worthington curtains were "not cylindrical, columnar, or cylindraceous as defined in the claims." [DX 175 at 130]. This argument was made specifically in reference to a claim (then, claim 1 [*see* DX 175 at 96], which eventually became claim 3 of the '179 patent) that described a "flexible hollow columnar, double walled curtain," but did not use the words cylindrical or cylindraceous. [DX 175 at 55]. Thus, it is evident that Norman McCreary equated a columnar curtain with one that was cylindrical or cylindraceous.

Secondly, during the prosecution of his third application, Norman McCreary distinguished his invention from the Vaughen patent, which he maintained did not disclose "a substantially straight vertical columnar wall." [DX 176 at 138]. The Vaughen patent had a plurality of rectangular cavities surrounded by bristles at the lower periphery of each rectangular cavity. [DX 192]. Accordingly, the walls of the Vaughen invention were straight and vertical. McCreary, however, argued that these walls were not *columnar.*

Again, it is readily apparent that McCreary used "columnar" to refer to a curtain that was substantially circular in horizontal cross-section, *i.e.*, cylindraceous, rather than rectangular. Therefore, based on the ordinary understanding of the word, the language in the specification, as well as the prosecution history, the court finds that "columnar," as used in the claims, denotes a curtain that is substantially cylindrical.

Lastly, plaintiffs contend that, notwithstanding the horizontal cross-section of the curtain, the outer curtain wall described in claims 3, 6, and 7 need not be substantially vertical. Again, plaintiffs' position is inconsistent with the settled meaning of "columnar," which denotes substantially vertical sides (*i.e.*, cylindrical). First, plaintiffs point to the examiner's remark that the columnar curtain claimed by McCreary was present in the 1965 Cockerell patent, which had an outwardly bulging curtain wall. [DX 175 at 158; DX 202]. However, Norman McCreary never accepted or disputed this contention, but rather filed an affidavit stating that his invention was made prior to disclosure of the Cockerell invention in a 1958 British patent. Thus, the examiner's position was left unaddressed. This ambiguous event in the prosecution history is insufficient to demonstrate that Norman McCreary intended to give the term columnar anything other than its common meaning—substantially cylindrical.

Next, plaintiffs note that claim 5 of the McCreary patent (a claim which is not at issue in this suit) provides for a flexible curtain "having an outer substantially vertical wall during normal operation." Because claims 3, 6, and 7 are independent of claim 5 and do not contain this provision, plaintiffs argue that they are not limited to curtains with substantially vertical walls. However, the cited language in claim 5 is inextricably tied to the further limitation requiring that the single-walled curtain of claim 5 have "a continuous sidewise extension at its lower edge to produce ... a downward pull at the lower edge of said curtain." Thus, claim 5 is differentiated from the other claims because it has a single-walled curtain with a continu-

ous sidewise extension at its lower edge which results in a substantially vertical curtain. Claims 3, 6, and 7 do not require a sidewise extension at the lower edge of the curtain because they disclose double-walled curtains. Thus, claim 5 is distinguished from claims 3, 6, and 7 based on its single-walled curtain and its "sidewise extension." Accordingly, the language of claim 5 does not suggest that Norman McCreary intended to give the term "columnar" anything other than its ordinary and accustomed meaning.

The court therefore concludes that the term "columnar," as used in claims 3, 6, and 7 of the McCreary patent, requires a double-walled, flexible curtain that is substantially cylindrical. Thus, these claims require a curtain that is substantially circular in horizontal cross-section and whose outer wall is substantially vertical.

### 3. *"Orbital"* (claim 13)

Finally, Claim 13 requires "an *orbital,* flexible, channel shaped, sheet curtain" to contain an air cushion beneath a horizontal platform. [DX 172, col. 35, Ins. 37–38 (emphasis added)]. In the patent specification, as was described above, Norman McCreary used the term "orbital" synonymously with the word "circular." He described a circular embodiment of his "flexible, hollow, columnar diaphragm curtain" as "an orbital, flexible, channel shaped, sheet curtain ... which, in this embodiment, is *orbital or circular."* [DX 172, col. 7, Ins. 40–43 (emphasis added)]. This usage is consistent with the general definition of an "orbit," which is "a path described by a celestial body [or] an artificial satellite" and is usually substantially circular. Webster's Third New International Dictionary 1586 (1986). Furthermore, this passage also demonstrates that Norman McCreary used the word "orbital" synonymously with "columnar." Inasmuch as we hold that the term "columnar" requires a substantially circular skirt or curtain, then an "orbital" curtain must also be substantially circular. Accordingly, the court concludes that claim 13 mandates a flexible, channel-shaped sheet curtain that is substantially circular in horizontal cross-section.[7] In sum, the court

---

**7.** Plaintiff apparently does not dispute this interpretation of the term "orbital," and no evidence

in the record suggests that Norman McCreary intended to give that word some other meaning.

holds that claim 1 does not mandate a curtain that is substantially circular in horizontal cross-section, while claims 3, 6, 7, and 13 do.

B. *A Space Between the Curtain's Upper Inner Edge and the Supporting Platform.*

Next, the parties are in disagreement over whether claims 1, 3, 6, 7, and 13 of the McCreary patent require that the upper inner edge of the double-walled skirt or curtain be spaced from (*i.e.,* not sealed to) the supporting platform. This issue is significant because the accused craft all have pressurized bags or skirts that are sealed from both the outside air and the central air cushion, and thus maintained at a significantly higher internal air pressure.[8]

As always, the court begins by consulting the language of the patent claims, giving the terms their ordinary meaning as understood by one skilled in the relevant art. In order to assist in the court's interpretation of that language, the court also looks to the specification, the prosecution history, and the other claims.

Claim 1 provides for a curtain "the periphery [of which is] hermetically attached to said platform and the central portion [of which is] *restrained in a fixed position beneath said platform....*" [DX 172, col. 33, lns. 12–14

(emphasis added)]. Furthermore, claim 1 requires "direct communication between said annular cavity and said plenum cavity."[9] [DX 172, col. 33, lns. 18–20]. Similarly, in claim 13, McCreary claimed a lifting device with "a peripheral orbital support for a curtain ... with an outer edge secured to said peripheral orbital support and with an *inner edge secured to a support ... under said rigid supporting member....*" [DX 172, col. 35, lns. 37–42 (emphasis added)]. Again, this claim also mandated that "said peripheral air space and said core air space [be] connected for interchange of air." [DX 172, col. 35, lns. 46–47].

In both claims 1 and 13, the clear language establishes that upper inner edge of the double-walled curtain must be spaced from the supporting platform. Claim 1 contains the unmistakable limitation that the inner edge be "restrained in a fixed position beneath" the platform, while claim 13 unambiguously requires that the upper inner edge be secured to a support "under" the platform. That these claims mandate such a spaced relationship is inescapable in view of the requirement (in both claims) that the annular or peripheral air space be connected to the core air space for the interchange of air. It is the space between the upper inner edge of

8. Plaintiffs contend that the claims of the McCreary patent do not require that the inner curtain wall be spaced from (and therefore not sealed to) the horizontal, supporting platform because figures 27, 27A, and 29 show an embodiment in which the inner curtain wall is admittedly sealed to the upper platform. In response, defendant observes that these illustrations were not among those selected by Norman McCreary when he made his two elections of species. Thus, defendant argues that Norman McCreary relinquished this embodiment from coverage by his patent application. Notwithstanding the merits of these competing contentions, both parties acknowledge that figures 27, 27A, and 29 (as well as their non-election) are only relevant if one of the asserted claims is broad enough to "read on" such an embodiment. [*See, e.g.,* Pl. Post–Trial Br. at 10; Def.Opp.Br. at 6–13]. In order to make such a determination, however, the court must first interpret the claims. Therefore, to say, as plaintiffs do, that the patent claims do not mandate a space between the upper inner curtain edge and the platform because figures 27, 27A, and 29 do not embody this limitation *and* that Norman McCreary's non-elec-

tion of those figures does not preclude such a finding because the claims read on those figures is clearly circular.

Accordingly, the proper course for the court is to interpret the language of the claims *first.* If the claims contain the limitation that the curtain's upper inner edge be spaced from the horizontal, supporting platform, then they are not broad enough to encompass figures 27, 27A, and 29. Conversely, if the claims as interpreted *do not* contain such a limitation, then they *are* broad enough to encompass those illustrations.

9. The term "plenum cavity" as used in claim 1 has a different meaning than the term "plenum chamber" in claim 3, as will be seen below. In claim 1, the plenum cavity is the air space contained within the double-walled, flexible curtain. In claim 3, the plenum chamber refers to an enclosed area above this core air space through which both the core and peripheral air spaces can communicate and are supplied. This difference in usage is apparently due to the fact that claim 1 was incorporated into the McCreary patent as a result of the interference proceeding with Mackie at the examiner's suggestion.

the curtain and the platform that allows for "direct communication" or "interchange" of air.

This understanding of the claim language is amply supported in the specification as well as the file wrapper. In describing his invention in the specification, Norman McCreary noted that the "air of the main part of the air cushion flows freely in and out of the space between the inner and outer walls automatically to fill such space with air at superatmospheric pressure...." [DX 172, col. 4, lns. 1–3]. In order for the annular air space to be automatically filled with air from the main air cushion, claims 1 and 13 both contain the limitation that the upper inner edge of the curtain be spaced from the platform and, therefore, *not sealed* thereto. Similarly, in explaining some of the figures contained in the patent, the specification explains that the upper inner edge is attached to a support beneath and spaced from the platform to allow the air in the main air cushion to flow "freely in and out of the space 38 between the inner wall 68 and the outer wall 62." [DX 172, col. 7, lns. 68–69]. The limitations in claims 1 and 13, interpreted in light of the specification, require this same spaced relationship in order to provide for "direct communication" or "interchange" of air (*i.e.*, the two-way flow of air between the annular and core air spaces).

Moreover, throughout the prosecution history, Norman McCreary distinguished his invention from the prior art based on the fact the air in the annular or peripheral space between the double walls of the curtain is "derived from the main air cushion." [DX 175 at 108]. For example, McCreary distinguished his invention from the prior Seck patent (U.S. patent number 2,743,787) during the prosecution of his second application as follows:

> In the Seck patent ... the [annular air] space 69 does not derive any air from the air cushion in any manner whatsoever since it seems to be sealed completely out of the circulation of the air cushion.

[DX 175 at 110; *see also* DX 175 at 114–15]. In this light, it is readily apparent that the language of claims 1 and 13 describes a space at the top of the inner wall of the curtain in order that the peripheral air space between the curtain walls may derive air from the main air cushion. Thus, the descriptions of the structure and functioning of McCreary's invention in the patent specification, as well as statements made during the patent prosecution by the inventor, confirm that claims 1 and 13 require a space between the upper inner edge of the curtain and the supporting platform.

With respect to claims 6 and 7, the claims delineate in identical language that the "flexible, hollow columnar double wall curtain [be] suspended at its upper edges from and sealed at its outer upper edge to said supporting member." [DX 172, col. 34, lns. 16–18 & 37–39]. In claim 3, a "plenum chamber" is "formed by an upper horizontal panel and an enclosing side wall construction extending downwardly." [DX 172, col. 33, lns. 27–29]. Like claims 6 and 7, claim 3 requires a "flexible hollow columnar, double walled curtain suspended at it upper edges from and sealed at its outer upper edge to *said plenum chamber*." [DX 172, col. 33, lns. 33–36 (emphasis added)]. Furthermore, claim 3 provides that the curtain "restrain[s] part of said air cushion between said flexible walls." [DX 172, col. 33, lns. 41–42].

Claim 3, therefore, describes a construction in which a plenum chamber is connected for interchange of air to both a core air space as well as to the annular or peripheral air space between the two walls of the curtain suspended from the plenum chamber. All three spaces (plenum, core, and curtain) together comprise the air cushion. Because the plenum chamber has side walls, a curtain whose inner wall is suspended from the plenum chamber is necessarily spaced from the upper, horizontal, supporting platform. In other words, the plenum chamber itself is the space between the upper inner curtain edge and the horizontal supporting platform. Again, this spaced relationship allows for the peripheral (curtain) air space to be filled with air from the main air cushion as is described in the claim language, the specification, as well as in the prosecution history.

Claims 6 and 7, however, do not require a plenum chamber with side wall construction. Rather, these claims provide that the curtain

is to be suspended from the supporting platform and sealed at the outer upper edge to that platform. Claim 6 dictates that an "air moving means" discharge air at superatmospheric pressure into the main air cushion. In addition, the inner and outer walls of the hollow curtain must contain a high pressure air body. This is accomplished by the inner wall extending "upwardly and inwardly from the lower edge ... into said air cushion." The only way that the curtain could be filled with high pressure air as required by claim 6 is if the peripheral air space is interconnected with the main air cushion since that is the only space that is filled with high pressure air by the "air moving means." Accordingly, in this light, the court interprets the language "suspended at its upper edges and sealed at its outer upper edge" in claim 6 to mean that only the outer wall is sealed, while the inner wall is spaced from the supporting platform to allow the peripheral or annular air space inside the curtain to be filled with high pressure air from the main air cushion.

Having thus concluded that the language "suspended at its upper edges and sealed at its outer upper edge" in claim 6 means that the inner upper edge is not sealed to the platform, the court is bound to interpret the identical language appearing in claim 7 to mean the same thing, *i.e.*, that claim 7 requires that the upper inner edge of the columnar curtain be spaced from (and not sealed to) the horizontal, supporting platform. *See Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1421 (Fed.Cir.1988) ("[the inventor] must use his words consistently...."). This interpretation of claims 6 and 7 is, of course, consistent with the previously discussed language in the specification and the file wrapper. Furthermore, the court's construction of claims 3, 6, and 7 is further supported by amendments made to those claims during their prosecution at the insistence of the patent examiner.

In the examiner's final rejection of McCreary's second application, he rejected the claims that eventually became claims 3, 6, and 7 of the '179 patent because these claims did not specify that the upper edge of the inner wall had to be spaced from the platform, but rather simply provided that the curtain be sealed to and suspended at its upper edge from the platform (or plenum chamber). [DX 175 at 155–59]. On August 27, 1965, the examiner rejected McCreary's fourth and final application on the same grounds as the second application. In response, Norman McCreary amended these claims to read in part: "suspended at its upper edges from and sealed at least at its outer upper edge to [the supporting platform]." [DX 177 at 162–63]. In a supplemental amendment, dated June 22, 1966, McCreary deleted the words "at least" from the three claims [DX 177 at 183–84] "in accordance with [an] interview" held between the examiner and McCreary's counsel. [DX 177 at 186].

▆▆▆▆ Plaintiffs contend that this final amendment, deleting "at least," did not change the meaning of claims 3, 6, and 7, but was purely formal. Such a reading would render that amendment completely nugatory and should, therefore, be avoided. Furthermore, one must look to the reason for an amendment in order to determine its significance. *See, e.g., Wang Labs. v. Toshiba Corp.*, 993 F.2d 858, 866 (Fed.Cir.1993); *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1361–62 (Fed.Cir.1991); *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 987 (Fed.Cir.1989). Here, the purpose of the amendment to these claims was to overcome the examiner's objection that the claimed invention requires that the upper, inner curtain edge be spaced from the platform. This was a substantive, not a formal, concern. Nowhere in the record is it indicated that McCreary succeeded in persuading the examiner that this understanding of the claimed invention was incorrect. Rather, it is more likely than not that Norman McCreary amended his claims in order to satisfy the examiner's concern. From this perspective, it is clear that the final amendment to what became claims 3, 6, and 7 was not purely formal. Therefore, consistent with this prosecution history the court interprets claims 3, 6, and 7 to require a space between the upper edge of the inner wall and the horizontal, supporting platform.

▆▆▆▆ Finally, plaintiffs observe that claim 8 of the '179 patent (a claim not at issue

here) explicitly provides for an "inner wall having *its upper edge spaced from said supporting member* so as to permit free communication between said air cushion and said columnar band defined by said inner and outer walls...." (emphasis added). Plaintiffs argue, based on the doctrine of claim differentiation, that since claims 1, 3, 6, 7, and 13, do not use virtually identical language, they must be construed to contain different limitations. Thus, plaintiffs contend that these claims cannot be construed to require that the upper edge of the inner curtain wall be spaced from the horizontal, supporting platform.

> [T]he concept of claim differentiation ... states that claims should be *presumed* to cover different inventions. This means that an interpretation of a claim should be avoided if it would make the claim read like another one. Claim differentiation is a guide, [however,] not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated.

*Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir.1991) (quoting *Autogiro Co. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 404 (1967)).

▮ In view of the foregoing discussion, the court finds that the relevant language of the claims at issue "will bear only one interpretation," namely that the upper inner curtain edge be spaced from the horizontal, supporting platform. Moreover, the doctrine of claim differentiation generally applies when a dependent claim contains a limitation not expressly delineated in the independent claim. In such a case, limitations from the dependent claim may not be read into the independent claim. *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed.Cir.1995); *Laitram*, 939 F.2d at 1538; *Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 712 (Fed.Cir.1990); *United States v. Telectronics, Inc.*, 857 F.2d 778, 784 (Fed.Cir.1988), *cert. denied* 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989). The case at bar, of course, involves multiple independent claims. As was stated by the Federal Circuit in *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n. 15 (Fed.Cir.1990), declining to apply the doctrine of claim differentiation, "it is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved." (citation omitted). Accordingly, the court must reject plaintiffs' argument in the instant case. The doctrine of claim differentiation does not, therefore, preclude an interpretation of claims 1, 3, 6, 7, and 13, *i.e.*, that finds these claims require a spaced relationship between the upper edge of the inner curtain wall and the horizontal, supporting platform.

### C. "Flexible" Curtain

▮ Third, the parties are in dispute over the proper interpretation of the word "flexible" as used in the claims. Each of claims 1, 3, 6, 7, and 13 requires a "flexible" curtain or diaphragm. Defendant argues that these claims mandate a curtain that is quite flexible and pliant, enabling the curtain to deflect when an obstacle is encountered during travel and to glide over that obstacle. In response, plaintiffs contend that defendant's construction of the term "flexible" is overly narrow and that the gliding action described is not required by the claim language.

Neither the defendant nor the plaintiffs allege that the term "flexible" has or had a special meaning for those skilled in the art of hovercraft design and construction. Accordingly, the court must begin with the ordinary meaning of "flexible" in the court's interpretation of that term. In general, "flexible" means "capable of being flexed" or "pliable." Webster's Third New International Dictionary 869 (1986). However, this definition is not particularly helpful because the dispute between the parties is over *how* flexible or pliable the curtain must be. The patent specification and prosecution history provide valuable guidance as to what Norman McCreary intended by his use of the word "flexible." Therefore, the court now turns to consider these interpretive sources.

Within the specification, Norman McCreary repeatedly describes how the flexible curtain in his invention was designed to yield to obstacles and pass over them. In the initial description of his invention, McCreary noted that his flexible curtain was

designed to "flex and pass over large ob-structions." [DX 172, col. 2, ln. 75—col. 3, ln. 1]. In addition, Norman McCreary distinguished his curtain from a rigid wall, which "would not yield when encountering a stone or the like, so the vehicle would have to stop suddenly or the wall 46 would be broken. The gliding action shown in FIG. 10 is not possible without the curtain of this invention." [DX 172, col. 10, lns. 72–75]. Figure 10 depicts the flexible curtain of the hovercraft tucking under the horizontal platform as the vehicle passes over an obstacle. *See* Appendix A. Finally, at the conclusion of the specification, in summing up his invention, Norman McCreary stated, "The curtain is so constructed that it yieldingly glides over relatively high objects...." [DX 172, col. 32, lns. 69–71]. Thus, the specification makes clear that the inventor regarded his curtains ability to be deflected under the platform and to pass over obstacles as critical to his invention. In this light, a "flexible" curtain is one which can accomplish this gliding action. Therefore, "flexible" as used in the patent claims means capable of being deflected by an obstacle and, thereby, passing over such obstacle.

This understanding is confirmed by the prosecution history of the McCreary patent. During the prosecution of McCreary's second patent application, Norman McCreary often distinguished his invention from the prior art cited by the examiner. For instance, he distinguished the Seck patent from his invention, noting that that reference disclosed "rigid metal curtains ... [that] cannot ride over obstacles, as shown in Figure 10 of applicant's drawings." [DX 175 at 129]. Later, McCreary again re-emphasized his point that the "flexible curtain ... allows ... the device [to] pass over obstructions in a surprising manner." [DX 175 at 130–31]. This argument demonstrates that McCreary intended his curtain to be flexible enough so that it could ride over obstacles. Therefore, the court interprets the term "flexible," which appears in claims 1, 3, 6, 7, and 13, to mean that the curtain must be pliant and yielding and capable of being deflected under the platform if an obstacle is encountered, so that the craft can glide over that obstacle.

## D. *Venturi Effect*

■ Fourth, the court considers the relationship between Norman McCreary's patented invention and the so-called Venturi effect. As applied to the McCreary patent, the Venturi effect is a downward pull exerted on the lowermost portion of the double-walled curtain and caused by the escape of high velocity, low pressure air immediately beneath the curtain. This low pressure stream escaping from the air cushion under the lower edge of the curtain tends to pull relatively flat surfaces (like the lower edge of the double-walled curtain where the inner and outer walls meet) towards it, like a vacuum would. This effect is often felt in a curtained bathroom shower, where the shower nozzle shoots out water fairly rapidly. Consequently, the shower curtain is pulled inward which is caused by the slight reduction in pressure in the shower, while normal pressure exists on the outer side of the shower curtain. This effect is described in claim 3 as follows:

> ... said curtain having two flexible walls ... joined together at the lower edge of said curtain and restraining part of said air cushion between said flexible walls at relatively high air pressure and having its lower edge slightly spaced from a "ground" surface under normal operation for restrained escape of air from said cushion between said lower edge of said curtain and said ground surface at relatively low air pressure to cause a downward pull on said air curtain.

[DX 172, col. 33, lns. 38–47]. This Venturi effect maintains the curtain of McCreary's invention in a substantially vertical position during normal operation and allows it to resume its normal shape after an obstacle has been traversed.

Plaintiffs concede in their post-trial brief that claims 3, 6, 7, and 13 embody a requirement that the curtain of McCreary's invention be pulled downward by the Venturi effect. They argue, rather, that "[t]he Venturi [e]ffect at the [l]ower [e]dge in [c]laims 3, 6, 7, and 13 [a]ppears on the [a]ccused [c]raft [e]ither [l]iterally or [u]nder the [d]octrine of [e]quivalents." [Pl.Post–Trial Br. at 82].

Each of these claims contains a requirement that the lower edge of the curtain be "slightly spaced" (or "spaced slightly" in claim 13) above the ground during normal operation.[10] Plaintiffs acknowledge that this slight spacing defines a gap at which there is a restrained escape of air from the air cushion. [*Id.* at 75]. This creates a kind of nozzle. Thus, as plaintiffs further explain, the pressure differential between the high velocity, low pressure air escaping below the curtain and the low velocity, high pressure air contained in the annular cavity "creates a downward pull against the lower edge." [*Id.*]. However, plaintiffs argue that claim 1 of the '179 patent does not contain a limitation that the curtain be slightly spaced from the ground and that, therefore, it does not embody a requirement that the curtain be pulled downward by the Venturi effect.

There can be no doubt, and plaintiffs concede this, that claims 3, 6, 7, and 13 define a curtain that is pulled downwards by the Venturi effect. Such a requirement is inherent, as explained above, in the limitation that there be a narrow gap between the ground and the curtain as well as the presence of pressurized air within the double-walled curtain. Defendant maintains that claim 1 also contains this requirement based on the description therein of a "ground proximity" hovercraft with a depending curtain. [DX 172, col. 33, ln. 9]. The government contends that the "ground proximity" limitation in claim 1 is the equivalent of the "slightly spaced" limitation in the other claims. Thus, on the same premise outlined above, the government argues that claim 1 also mandates a curtain that is pulled downwards by the Venturi effect.

Based on some enlightening and relevant prosecution history, the court finds as a matter of claim interpretation, that claim 1 describes and defines a curtain that is pulled downwards by the Venturi effect by virtue of the limitation of a "ground proximity" device. As was previously noted, claim 1 originated in the Mackie application and was incorporated into the McCreary patent as a result of the interference proceeding between the two applications. In describing the curtain or diaphragm considered to be their invention, Mackie et al. observed:

> It will be noted that during operation the diaphragm 12 assumes a configuration defining a circular clearance 34 at the outer extremity of plenum cavity 32 of relatively shallow vertical extent. This shallow clearance functions to meter the rate of escape of air from the plenum cavity 32. . . .

[DX 179 at 7]. Since claim 1 is a product of the interference between the Mackie and McCreary applications in the PTO, it must be interpreted in light of the Mackie prosecution history and specification. *In re Spina*, 975 F.2d 854, 858 (Fed.Cir.1992) ("A claim is not interpreted one way in light of the specification in which it originally was granted, and another way in light of the specification into which it is copied as a proposed interference count.").

In this light it is obvious that claim 1, by dint of its defining a "ground proximity" device comprised of a platform with depending diaphragm, also requires a curtain that is slightly spaced from the ground surface. In this way, the escape of air from the air cushion is restrained. Claim 1, therefore, also defines a double-walled curtain filled with high pressure, low velocity air, below which high velocity, low pressure air escapes. Thus, the same downward pull must be exerted on the diaphragm of claim 1 by the Venturi effect as it must in the other claims. Accordingly, claims 1, 3, 6, 7, and 13 all contain a limitation, inherent in the narrow clearance of the curtain from the ground, that the curtain is pulled downward by the Venturi effect.

The court's interpretation of these claims is confirmed and supported by the statements made by Norman McCreary during the prosecution of his patent applications as well as in the specification of the patent as eventually issued. During the prosecution of the second McCreary application, Norman McCreary distinguished his invention over all

---

10. The McCreary patent does not explicitly define the term "slightly spaced," but it does suggest, in describing one embodiment, that the space be "between 1½—2½ inches." [DX 172, col. 9, ln. 26; *see also* DX 172, col. 10, ln. 69].

prior art references cited by the examiner based on the presence of the Venturi effect in his device. For example, McCreary argued that:

the greater pressure above [the lower edge of the curtain] produces a downward pulling action on [that lower edge] to hold the curtains 62 and 68 tight and in a downward position. This action is illustrated in the sketches and description in Appendix A of this amendment.

There is nothing like this in Worthington, Nicin or Aviation Week.

[DX 175 at 109]. Similar statements were repeated throughout the file wrapper. [*See* DX 175 at 110–16]. Appendix A, referred to above, contains illustrations and an explanation of the Venturi effect, showing how this effect exerts a downward pull on the lower curtain edge. [DX 175 at 125].

At a subsequent interview with the examiner, one of McCreary's models was demonstrated for the examiner to illustrate this Venturi action. Norman McCreary later stated: "It is believed that this principle [the Venturi effect] was agreed to be novel, at the interview, over *all references of record.*" [DX 175 at 129 (emphasis added)]. In the fourth and final application, Norman McCreary again distinguished his invention from the prior art, relying on the use of the Venturi effect in his invention. In this connection, he declared:

Neither Seck nor Gaska suggest a construction or method wherein a flexible curtain or diaphragm is held down by air pressure [*i.e.*, the Venturi effect] as in the instant invention ... [U]nlike the instant invention [the curtains of Gaska and Seck] are held down only by gravity.

[DX 177 at 170].

Finally, in the specification of McCreary's '179 patent, he notes:

In the embodiment of FIGS. 1 through 5, for example, as well as in corresponding elements in *all* other *embodiments,* the flow of superatmospheric air into the annular curtain space 38 and into the core air space 34 should ... maintain a proper relative pressure in the spaces 38 and 34 to maintain the curtain walls 62 and 68 in

down position, during operation, as shown in FIG. 2, with the aid of the Venturi action at 56 [the narrow gap between the curtain's lower edge and the ground]. The same relationship of pressures should be maintained in all other embodiments herein disclosed.

[DX 172, col. 32, lns. 48–57 (emphasis added)].

In view of all of the foregoing, it is evident that Norman McCreary believed and intended that the use of the Venturi effect to pull his curtain downward was a defining characteristic of his invention. Consequently, the court is bound to interpret the language of the claims in this light. Accordingly, the court construes claims 1, 3, 6, 7, and 13 to mandate a double-walled curtain the lower edge of which is pulled down by the Venturi effect. This is accomplished due to the pressure differential between the air that fills the curtain from the main air cushion and the high velocity, low pressure air that escapes through the narrow space or gap beneath the curtain's lower edge.

E. *Claim 19*

Lastly, the court must interpret claim 19 of the McCreary patent in order to complete the first phase of analysis. Claim 19 reads as follows:

19. A ground effect vehicle comprising a horizontal support frame and at least three separate, noncommunicating plenum chambers extending downwardly therefrom, a ducted fan arranged for discharging into at least two of said chambers, guide means defining at least two separate, nonintercommunicating flow passages from the immediate vicinity of the discharge side of said fan and into respective ones of said two plenum chambers.

[DX 172, col. 34, lns. 24–31].

The parties, in their post-trial briefs, do not raise any dispute over the interpretation of this claim, and in any event the language of the claim is relatively straightforward. Claim 19 relates to a ducted fan arrangement to fill multiple plenum chambers with pressurized air. There is no requirement that the plenum chambers be surrounded by any particular type of curtain. However, consis-

tent with the court's construction of the term "direct communication" in claim 1, the court is constrained to interpret "noncommunicating" and "nonintercommunicating" to mean that air from any one plenum chamber or flow passage cannot, and does not, flow into any other plenum chamber or flow passage. In other words, once the air flows away from the fan, that air flows through a flow passage into a *single* plenum chamber and, eventually back into the surrounding atmosphere, without entering another flow passage or plenum chamber. This understanding is supported by the specification and the diagrams. In the patent diagrams, all of the multiple plenum chamber embodiments of the McCreary invention have curtains whose "outer walls 648 [are] spaced from each other sufficiently to permit free exit of air" from each independent air cushion into the atmosphere. [DX 172, col. 24, lns. 70–71, & figs. 34–54].

Furthermore, the patent specification also indicates that the term "plenum chamber" in claim 19 is used in the same sense it was used in claim 3. Specifically, each of the "separate, noncommunicating plenum chambers" in claim 19 is an enclosed area directly below the supporting platform, which contains one of several supporting air cushions, through which the peripheral air space (between the curtain walls) and the core air space are supplied with superatmospheric air. [DX 172, col. 24, lns. 46–51, & col. 30, lns. 36–48]. In other words, the plenum chamber is the uppermost part of the air cushion. Claim 19, which mandates at least three separate plenum chambers, therefore requires at least three separate air cushions.

With this understanding of claim 19, and with the foregoing interpretation of claims 1, 3, 6, 7, and 13, the court now must ascertain whether any of the patent claims have been infringed by the accused devices.

## IV. INFRINGEMENT—APPLICATION TO THE ACCUSED CRAFT

■■■■■ If every limitation or element of a single patent claim is found in the accused device or product, *exactly,* the accused device is said to literally infringe the patent, and the patent holder is entitled to compensation for that infringement. *Southwall Technologies,*

*Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558, 1562 (Fed.Cir.1986); *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.,* 757 F.2d 255, 257 (Fed.Cir. 1985). Unless each and every claim limitation reads precisely on the accused device, however, there is no literal infringement. *Johnston v. I.V.A.C. Corp.,* 885 F.2d 1574, 1580 (Fed.Cir.1989).

■■■■■ Even where the accused device does not literally infringe the claim, infringement may still be found, under the doctrine of equivalents when the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950); *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934 (Fed.Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 *and cert. denied,* 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir. 1983). But, those who would advance the state of the art in a particular field must be able to rely on the claim language of patents in their field to avoid infringement of those claims. To protect this right, the doctrine of equivalents must not be used to broaden claims beyond their originally intended structural and functional limitations. *Pennwalt,* 833 F.2d at 935; *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532 (Fed.Cir.1987). In this regard, the Federal Circuit has instructed that findings of infringement under the doctrine of equivalents should be "the exception ... not the rule." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991).

At bar, plaintiffs contend that the accused vessels, the LACV–30, the LCAC, and the Jeff–B, infringe the McCreary patent both literally and under the doctrine of equivalents. After a comparison of the accused craft and the patent claims, however, the court concludes, to the contrary, that the accused vehicles do not infringe the

McCreary patent. The court begins by addressing plaintiffs contention that the patent claims at issue in this case are literally infringed by the accused vessels before turning to consider whether any of those claims are infringed under the doctrine of equivalents.

### A. *Literal Infringement*

 Because "[a] patent is infringed if a single claim is infringed," *Intervet Am., Inc. v. Kee–Vet Labs.*, 887 F.2d 1050, 1055 (Fed.Cir.1989), the court must individually examine each of the asserted claims to ascertain whether they have been infringed by any one of the accused vehicles. At the outset, the court notes generally, however, that plaintiffs allege that the double-walled, flexible curtain attached to a horizontal, supporting platform disclosed in claims 1, 3, 6, 7, and 13 is literally infringed by the peripheral bags on the LACV–30, the LCAC, and the Jeff–B. In this regard, plaintiffs maintain that the addition of the finger skirt to the bottom of the bag on the accused craft will not prevent a finding of infringement. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1057 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Of course, the finger skirt itself does not literally infringe the McCreary patent because it is not double-walled and therefore, does not define a peripheral air space, as required in the claims. Claim 19 is again addressed separately below.

### 1. *Claim 1*

None of the accused craft infringe claim 1 of the McCreary patent. First, the inner wall of the bag on each of the accused vessels is sealed to the deck and is not "restrained in a fixed position beneath said platform" as dictated by the claim language. [DX 5; DX 6; DX 12; DX 13]. As indicated above, this language requires a space between the curtain's upper inner edge and the horizontal, supporting platform so that the annular cavity can derive air from the main air cushion.

In this connection, there is no "direct communication" of air between the interior of the bag and the air cushion of the accused vessels. Rather, due to the pressure differential between the two areas (the bag is at approximately 140%, and up to 150% on the LACV–30, of the pressure of the central air cushion on the accused vessels), there is only a one-way flow of air from the bag, through the relatively small one-way holes on the inner wall of the bag, and into the air cushion. [DX 7; DX 309–D]. Claim 1 requires that air be able to flow in two directions, to and from the peripheral air space. This feature of the McCreary patent allowed the annular curtain to be filled with air from the core air space and, as a result, be relatively flexible or pliant. However, defendant's technical expert, David Lavis, testified that:

> In the case of the accused craft, there is no way that air can flow from the core air space into the annular air space.
>
> \* \* \* \* \* \*
>
> ... there's no way in which air in the cushion can flow into the bag, because the bag will always remain at a pressure higher than the cushion. It will always be a one-way flow.

[Tr. 2380 (Lavis)]. Therefore, neither the limitation of being restrained in a fixed position beneath the platform or of providing direct communication (two-way air flow) between the annular cavity and the main air cushion is present in the accused craft.

Second, the bags of the accused vehicles are not "flexible" as required by claim 1. As explained, *supra*, this limitation mandates a curtain or diaphragm that yields easily when encountering an obstacle, deflecting under the platform and gliding over that obstacle. The bags of the accused craft are not pliant in this manner, but are significantly resistant to obstacles as a result of being inflated with air at substantial pressure. Furthermore, the bags of the accused vehicles do not deflect and tuck under the platform when encountering an object but, rather, move outward and upwards only upon a significant impact from an obstacle. Defendant's witness, Charles Harry, who had considerable experience with the development and construction of the accused vehicles, testified at length concerning this feature of the accused vessels, demonstrating the same with a videotape of those hovercraft. Thus, the bags

are not "flexible" as required by the McCreary patent.

Third, by virtue of the limitation that the curtain contain an air cushion beneath a "ground proximity" device, claim 1 requires a curtain that is slightly spaced (roughly speaking, a few inches) above the ground. This feature enables the McCreary vehicle to make use of the Venturi effect below its lower edge to pull the curtain downward and maintain a vertical shape. The bags on the accused craft are not in close proximity to the ground surface but are, rather, approximately 2½ feet (i.e., about one-half of the total air cushion height) from the ground surface during normal operation. [DX 16]. In addition, there is no escape of high speed air at the lower edge of the bags, due at least in part to the attachment of finger skirts to the bags in the accused vessels. Moreover, as a result of the high clearance of the bag above the ground and the lack of escaping air beneath the bag's lower surface, there is no Venturi effect exerting a downward pull on the bag of the accused vessels. While plaintiffs argue that the Venturi effect is present around the holes on the inner wall of the bag, Mr. Lavis persuasively testified that any such effect is minimal and, furthermore, is exerted equally in all directions, thereby, cancelling out any pulling effect. [Tr. 2251–55 (Lavis)]. As a consequence, the court finds that the bags on the accused hovercraft lack the "ground proximity" and the resultant downward pulling Venturi effect mandated by claim 1. Therefore, because the bag that is utilized in each of the accused craft does not meet the foregoing claim limitations, claim 1 is not literally infringed by these craft. The court should note that it found Mr. Lavis a highly credible witness under expert and often grueling cross (and recross) examination lasting a number of days.

### 2. Claim 3

Claim 3 is likewise not infringed by the LCAC, the LACV–30, or the Jeff-B. As discussed above in reference to claim 1, the bag that surrounds the main air cushion on each of these accused craft is not "flexible" as that term, appearing in claim 3, is construed by the court. Nor are the bags of the accused vehicles "slightly spaced" from the ground during normal operation as required by claim 3. It therefore follows that there is no "restrained escape of air" beneath the lower edge of the bag "to cause a downward pull on" the bags. Thus, the accused vessels do not make use of the Venturi effect in the manner disclosed in claim 3. Finally, like claim 1, claim 3 mandates that the inner curtain edge be spaced from (i.e., not sealed to) the horizontal, supporting platform and interconnected with the core air cushion. The accused vessels do not contain this limitation because the bag that is used on each of these craft is sealed at its inner upper edge to the platform. [DX 5; DX 6; DX 12; DX 13].

In addition, the bags of the accused vehicles are not "columnar" as dictated in claim 3. As the court held, supra, a "columnar" curtain must be substantially circular in horizontal cross-section and must have substantially vertical sides. The bags on the accused vessels are neither. The bags are rectangular in shape, and their side walls bulge outward like an inner tube. [DX 3; DX 6; DX 12; DX 13; DX 16]. Thus, the accused vessels do not contain the further limitation that the double-walled curtain be "columnar." Accordingly, claim 3 is also not literally infringed by any of the accused craft.

### 3. Claim 6

Similarly, the accused craft do not literally infringe claim 6 of the McCreary patent. Again, claim 6 mandates a "columnar" and "flexible" double-walled curtain, the upper inner edge of which is spaced from (not sealed to) the platform of the vehicle, and the lower edge of which is "slightly spaced" from the ground. In addition, claim 6, like the other claims, requires the presence of a downward pulling Venturi effect at the lower edge of the curtain. As the court has previously found, the bags on the accused vessels are not "columnar." Nor are the bags "flexible" as that term was used by Norman McCreary. Furthermore, the bags on the accused vessels are not pulled downward by the Venturi effect as their lower edges are not "slightly spaced" from the ground and there is no "high velocity low pressure air stream" beneath the bags. Lastly, claim 6

states that the double-walled curtain must contain "low velocity high pressure air." The testimony developed at trial indicates that the air in the bag of the accused hovercraft is at *high* velocity, traveling at approximately 60 feet per second, during normal operation. For all these reasons, the limitations of claim 6 fail to "read on" the accused craft. Thus, claim 6 is not literally infringed by any of the accused craft.

### 4. *Claim 7*

Once again, the limitations of claim 7 require a "flexible" and "columnar" double-walled curtain, the upper inner edge of which is spaced from (not sealed to) the horizontal platform or deck of the craft, the lower edge of which is "slightly spaced" from the ground, and which is pulled downward by the Venturi effect. As the court has found above, the accused vessels embody none of these claim limitations. Therefore, neither the LACV–30, the LCAC, nor the Jeff–B literally infringes claim 7 of the McCreary patent. Consequently, the court need not address whether any of the accused vehicles contain the "movable weight means to produce a controlling force" mandated in claim 7.

### 5. *Claim 13*

Next, the court finds that claim 13 is not literally infringed by any of the accused craft. First, the bag on each of the accused craft is rectangular and is, therefore, not an "orbital" curtain as required by claim 13. Next, the inner walls of these bags are sealed at their upper edge to the deck of the vehicle. As a result, the bags are not attached to a support "under said rigid supporting member" as claim 13 dictates. Nor are the air space within the bag of each of the accused craft and the core air space surrounded by the bag "connected for interchange of air." Claim 13 requires a two-way air flow between the annular or peripheral air space and the core air space. However, the accused vessels possess only one-way air flow from the bag, through the holes in the inner wall, and into the main air cushion. Moreover, as set forth above the bags of the accused craft are not "flexible" as claim 13

mandates, and, finally, the accused craft do not make the requisite use of the Venturi effect to exert a downward pull on the bags. Therefore, the accused craft do not literally infringe claim 13 of the '179 patent.

### 6. *Claim 19*

Lastly, the court finds that claim 19 is not literally infringed by the accused LACV–30.[11] A vehicle constructed according to claim 19 requires "at least three separate, noncommunicating plenum chambers" and "at least two separate, nonintercommunicating flow passages" that discharge air from the fan "into respective ones of said two plenum chambers." As the court held, *supra*, this language requires that the air that flows through any passage or into any plenum chamber not flow into any other air flow passage or plenum chamber, respectively. In the LACV–30, the main air cushion is subdivided into four compartments. [DX 3; DX 217]. The air cushion contained below the craft by the bag and finger skirt is divided lengthwise by a "keel trunk" or "longitudinal stability seal." On either side of the keel trunk, the cushion is further subdivided by transverse or lateral "stability seals," spanning from the side bag inboard to the keel trunk at about half-way down the length of the craft, thereby creating four compartments. [DX 3; DX 217]. *See also* Appendix L.

However, air flows freely between these four compartments. As Mr. Lavis explained, the lowermost edge of the "seals" dividing the compartments is above the lowermost edge of the fingers (the "hemline"). [Tr. 2536 (Lavis)]. This relationship was also confirmed by Mr. Harry, who indicated that the longitudinal (keel) and transverse stability seals were about nine inches higher at their lower edge than the lower edge of the fingers or hemline. [Tr. 1632–35 (Harry)]. As a result, air can pass freely under the "stability seals" and/or the "keel trunk" from one compartment into another and vice versa. Furthermore, the diagrams and photographs admitted into evidence demonstrate that the transverse trunks or seals are not

---

**11.** We only address the LACV–30 in our discussion of claim 19, because plaintiffs, during trial, abandoned any assertion that claim 19 is infringed by either the LCAC or the Jeff–B.

airtight seals between the compartments but, rather, that there are gaps through which air may pass from one compartment to another and vice versa. [DX 1; DX 217]. *See also* Appendices G & H. These air cushion compartments on the LACV–30 are, thus, not "separate, noncommunicating plenum chambers" because air can flow (*i.e.,* communicate) between the various compartments.

Moreover, in the LACV–30 (as well as the other accused craft), the U–shaped peripheral bag itself acts as a "flow passage" delivering air, through holes in the inner wall, to the various compartments. [DX 1]. Two "lift fans" discharge air directly into this peripheral bag or trunk, inflating that bag as well as the lateral stability seals (by means of a duct on either side from the peripheral bag to the lateral seal). [DX 1]. But, since all the compartments are supplied with air by a common (intercommunicating) flow passage (the bag), the bag does not discharge air into a "respective" compartment. Therefore the U–shaped peripheral bag of the LACV–30 is not a "separate, nonintercommunicating flow passage[ ]" as described in claim 19.

In addition to discharging air into the peripheral bag, the lift fans on the LACV–30 (one on each side, towards the rear) also have ducted outlets. Each fan connects to a duct through which air flows directly into the rear trunk on that side of the craft. [DX 1]. Each lift fan also has a duct leading away from it which directs air from the fan into the keel trunk. [DX 1]. None of these ducts on the LACV–30, however, is a "nonintercommunicating flow passage[ ]" through which air is discharged "into [a] *respective one[ ]* ... plenum chamber[ ]," as provided in claim 19.

First, the air that flows through the one duct (per fan) and into the associated rear trunk eventually escapes, through holes in the back of the attached cones, into the atmosphere, never entering any part of the air

cushion that supports the vehicle. [DX 1; DX 2]. This air is not, therefore, discharged into a "plenum chamber." Secondly, there are two ducts (one from each fan) which discharge air into the keel trunk. From there, the air can flow into any one of the four cushion compartments. [DX 1]. Thus, these air flow passages (one from each fan to the keel trunk) are not "nonintercommunicating" (the air communicates within the keel trunk), nor do they discharge air into a respective single plenum chamber (air flows into all four compartments).

Accordingly, the limitations of claim 19 are clearly not present in the LACV–30. Consequently, the court finds that the LACV–30 does not literally infringe claim 19 of the McCreary patent.

For all of the foregoing reasons, the court finds that none of the asserted claims is *literally* infringed by any of the three accused hovercraft. However, plaintiffs also maintain that each of the asserted claims is infringed under the doctrine of equivalents.

### B. *Doctrine of Equivalents*

 As was stated above, even if literal infringement is not found, the court may next consider whether a finding of patent infringement exists under the doctrine of equivalents. "[T]he application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1518 (Fed.Cir.1995) (en banc). In general, an accused device or product will be found to infringe a patented invention under the doctrine if "it performs substantially the same function in substantially same way to obtain the same result." *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856, *quoted in Southwall Technologies,* 54 F.3d at 1579.[12] In applying this test, a substantial

---

**12.** In *Hilton Davis,* the Federal Circuit, in an *en banc* decision, identified factors other than function, way, and result as pertinent to a doctrine of equivalents analysis, for instance, the "known interchangeability" of elements, "evidence of copying," and evidence of "designing around" the patent claims. 62 F.3d at 1518–20. However, as the parties have not put on evidence relat-

ed to these additional factors and have not argued their importance, and because it appears from the record that none of these factors are present here, we need not consider these additional factors related to the substantiality of the differences between the claimed and accused vessels. Therefore, we follow the traditional

equivalent must be found for every limitation or element of the patent claim "somewhere in an accused device, but not necessarily in a corresponding component, although that is generally the case." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989).

Because, as is explained below, the court finds that the accused vehicles do not perform substantially the same function *in substantially the same way* to obtain the same result as any of the asserted patent claims, the court concludes that the McCreary patent is not infringed by either the Jeff–B, the LCAC, or the LACV–30. As before, the court begins its discussion with an analysis of whether claims 1, 3, 6, 7, and 13 are infringed under the doctrine of equivalents, and then address claim 19 separately below.

### 1. *Claims 1, 3, 6, 7, and 13*

In the case at bar, both the flexible, double-walled skirt that is the McCreary invention (claims 1, 3, 6, 7 and 13) and the bags and finger skirts of the accused craft may be said to achieve the same general result. Both allow a vehicle or device supported on a cushion of pressurized air to traverse obstacles and irregular surface conditions. While the accused craft seem in large measure aimed at achieving this general result in a "rough water," marine environment, and the claimed invention is apparently directed primarily to operation over land, the court need not make too much of this distinction given the court's analysis below.

Moreover, both the McCreary invention and the bags and finger skirts on the accused vehicles perform many of the same general functions. The double-walled, flexible curtain or skirt defined in the McCreary patent claims performs the function of containing the supporting air cushion beneath a rigid deck or platform. On the accused craft, this function is performed in combination by the inflated bags and the single-walled finger skirts.

Second, McCreary's flexible and pliant double-walled skirt also performs the func-

tion of deflecting back to allow a hovercraft to traverse an obstacle. This function is performed on the accused vehicles by the individually deflectable, single-walled fingers. In contrast, the bags of the accused military vessels respond to obstacles by rising upward and outward when a significant obstacle (*e.g.*, a large wave) is encountered to perform the distinct (but related) function of keeping the fingers in their proper position.

Finally, the double-walled, flexible curtain, described by the McCreary patent claims, performs the function of resealing to the ground surface upon the traversing of an obstacle to maintain the air cushion. On the accused vessels, the deflectable fingers perform the same function. They resume their normal configuration after going over an obstacle, preventing the loss of air pressure from the cushion. However, while each of the foregoing functions is arguably performed by a component of the accused craft, these functions are performed in a substantially *different* way by the accused craft.

First, in the McCreary invention, the double-walled, flexible curtain is maintained and resumes (after traversing an obstacle) its normal operating shape and sealing condition by using the Venturi effect at the lower edge of the double-wall. There is always, in this invention, a downward-facing, horizontal surface area to be pulled down by the Venturi effect into substantially sealing condition to the irregular terrain. For example, Norman McCreary described his invention in the patent specification, as follows: "The curtain is so shaped that it easily glides over relatively high obstructions and relatively rough 'ground' surface in a surprising manner." [DX 172, col. 3, lns. 35–38]. Furthermore, as an obstacle passes under the double-walled curtain, the flexible curtain is pulled downward by the Venturi action to reseal with the ground, and resume its normal operating configuration. Again, McCreary noted in his patent specification: "The construction of the curtain is such that it automatically restores itself to normal operating condition if relatively high objects are encountered, or if the structure is temporarily tilted." [DX 172, col. 4, lns. 17–20].

function-way-result test in our analysis of the instant case.

Second, McCreary's double-walled curtain is filled with air from the main air cushion (or core air space), which space is intercommunicating with the peripheral space between the curtain walls. Air can flow in both directions between the peripheral and core air spaces. This construction allows McCreary's flexible curtain to easily deflect over obstructions as air can be pushed out of the peripheral curtain and into the main air cushion. Then, as the obstruction is traversed, the peripheral air space can be refilled with air from the central air cushion. This ability, of course, contributes to the operation of the Venturi effect by providing for a pressure differential across a downward-facing lower surface area, below which a high velocity, low pressure air stream escapes.

On each of the accused vehicles, the lowermost portion of the air cushion is surrounded and contained by a skirt that is made up of many, adjoining, individually-deflectable, single-walled fingers. These fingers are maintained in their normal operating position by the outward pressure of the air cushion in combination with their finger-like shape and structure and their attachment to a relatively rigid, inflated bag. When any individual finger is deflected by an obstacle during travel, it subsequently resumes its normal operating configuration simply by the outward pressure exerted on that finger, contained by its shape and structure. There is no peripheral air space in the fingers, because the fingers are single-walled. As a result, the fingers do not present a downward-facing surface area, so that the fingers are not pulled down or maintained in their ground sealing condition in any appreciable way by the Venturi effect. Put simply, the bags and finger skirts of the accused military vessels operate in a substantially different way from the way that was Norman McCreary's patented inventive concept. There is no substantial equivalent of McCreary's flexible, double-walled curtain present in either the Jeff–B, the LCAC, or the LACV–30.

Claims 1, 3, 6, 7, and 13 of the '179 patent all define double-walled, flexible, peripheral curtains whose upper inner edges are spaced from the supporting platform and, thus, open to and inflated by the main air cushion. This allows such a curtain to maintain a sealing condition, to deflect easily over obstacles, and to resume the normal operating shape and sealing condition, making use of the Venturi effect. The accused craft have bags and finger skirts which operate in a substantially different way. Therefore, neither the Jeff–B, the LCAC, or the LACV–30 infringe any of these claims under the doctrine of equivalents.

However, even if the bag and finger components of the accused craft were substantially equivalent to the invention delineated by the limitations of the McCreary patent claims, the court would still be constrained to find that the accused vehicles do not infringe the McCreary patent based on an estoppel which arose during the prosecution history. Prosecution history estoppel (or file wrapper estoppel) bars the patentee from extending the range of equivalents accorded to the patented invention to subject matter relinquished or disavowed during prosecution of the patent. *Texas Instruments Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1173 (Fed.Cir.1993). An estoppel can arise "because of a change in claim language during prosecution" made to avoid a cited prior art reference or as a result of "[u]nmistakable assertions made by the applicant to the [PTO] in support of patentability, whether or not required to secure allowance of the claim...." *Wang Labs.,* 993 F.2d at 866–67 (citations omitted). *See also Texas Instruments,* 988 F.2d at 1173–75. In determining whether prosecution history estoppel applies, the court must examine the prosecution history "as a whole." *Wang Labs.,* 993 F.2d at 867; *Texas Instruments,* 988 F.2d at 1174.

As was explicated in detail above (in the claim interpretation section), Norman McCreary repeatedly emphasized the significance of the Venturi effect to his inventive concept. For example, in the prosecution of his second application, he argued that claims 1 and 7 (which later became claims 3 and 6), and, by reference, claim 10 (claim 7 of the McCreary patent) were patentable over the cited prior art, including Worthington, Nicin, Seck, and the *Aviation Week* article, by reason of the Venturi effect. Furthermore, in a

supplemental amendment dated September 20, 1962, McCreary argued that *all of his claims:*

> define a structure which provides the downward pull ... at the bottom of the curtain, when the curtain is elevated off the ground, so that the outward low pressure air can escape under the edge of the curtain to produce the downward pull on the lower edge of the curtain. It is believed that they clearly distinguish patentability over the references.

[DX 175 at 131–32]. These statements, and others like them throughout the file wrapper, constitute "[u]nmistakable assertions made by the patentee to the [PTO] in support of patentability...." *Wang Labs.*, 993 F.2d at 867. As a result of these assertions, the court holds that plaintiffs are estopped, under the doctrine of prosecution history estoppel, from extending the protection of the McCreary patent to equivalents which do not make use of the Venturi effect to hold the peripheral, double-walled curtain in its downward, ground-sealing condition.

Of course, the accused military vessels do not employ the Venturi effect in any manner. They certainly do not employ the Venturi effect to maintain the bags or finger skirts in their normal operating, ground-sealing configuration. Indeed, the testimony at trial established that the Venturi action was something to be avoided on the accused craft, as such a phenomenon could lead to potentially dangerous instability during operation. Accordingly, because plaintiffs are estopped from extending the protection of the '179 patent to cover equivalents which do not make use of the Venturi effect to maintain the normal operating configuration of the peripheral, double-walled curtain, the court is bound to hold that the accused Jeff–B, LCAC, and LACV–30 do not infringe any of claims 1, 3, 6, 7, and 13 of the McCreary patent under the doctrine of equivalents.

### 2. *Claim 19*

Finally, the court is left to consider whether the LACV–30[13] infringes claim 19 of the McCreary patent under the doctrine of

equivalents. Claim 19 defines a "ground effect vehicle" with "at least three separate, noncommunicating plenum chambers" supplied with air by "at least two separate, nonintercommunicating flow passages." [DX 172, col. 36, lns. 25–30]. These multiple noncommunicating plenum chambers are intended to be surrounded by a plurality of curtains to contain multiple air cushions. In this way, Norman McCreary's invention can "resist substantial tilting ... even when unevenly loaded." [DX 172, col. 23, lns. 41–43]. Thus, as explained in the Bertin application,[14] this invention is "particularly concerned with the stability of [ground effect] vehicles." [DX 182 at 2].

On the LACV–30, the air cushion is subdivided into four, *intercommunicating* compartments. The intercommunication of air between the four compartments of the LACV–30 provides a damping effect when operating over rough or uneven surfaces. The resulting pressure changes help counteract any tilting (pitch or roll) of the vehicle. In addition, as described earlier, these compartments are inflated with air through *intercommunicating* flow passages (*e.g.*, the peripheral bag and the keel trunk). This is done so that any single fan can inflate the entire bag and cushion system in the event of a failure in one of the fans.

By contrast, claim 19 defines a vehicle which is designed to achieve stability in a substantially different, and indeed opposite, way. In claim 19, every plenum chamber is totally independent of the others. As Norman McCreary explained in his patent specification, these air cushions are capable of sustaining significant loads independently of the others, and, thus, substantial tilting of the platform is resisted. [DX 172, col. 23, lns. 61–64]. Accordingly, the court finds that the LACV–30 does not perform substantially the same function in substantially the same way to achieve the same result as described in claim 19 of the McCreary patent. As a result, claim 19 is not infringed under the doctrine of equivalents.

---

**13.** *See* note 11, *supra.*

**14.** It should be recalled that claim 19 originated in the interference proceeding between Norman McCreary and Bertin.

Therefore, based on all of the foregoing reasons, none of the asserted claims of the McCreary patent is infringed by the any of the accused vehicles either literally or under the doctrine of equivalents. Plaintiffs have failed to prove their facie case by a preponderance of the evidence. Consequently, the court need not further address defendant's affirmative defenses—invalidity of the McCreary patent for anticipation, 35 U.S.C. § 102(a), obviousness, 35 U.S.C. § 103, and prior public use, 35 U.S.C. § 102(b). The court believes that this is also appropriate given the presumption that an issued patent is valid, 35 U.S.C. § 282, and especially since, in the instant case, "noninfringement is clear and invalidity is not plainly evident." *Mes-serschmidt v. United States,* 29 Fed.Cl. 1, 17 (1993).

## CONCLUSION

For the reasons stated in this opinion, the court finds that U.S. Patent 3,532,179 was not and is not infringed by the government's three accused military craft, the Jeff–B, the LCAC, and the LACV–30. Therefore, plaintiffs are not entitled to "reasonable and entire compensation" for the alleged unauthorized and unlicensed use or manufacture of the invention described in the McCreary patent under 28 U.S.C. § 1498(a). Judgment shall be entered for defendant, the United States, accordingly.

IT IS SO ORDERED.

## APPENDICES

*Appendix A:* Figures 2, 8, and 10 of the McCreary patent (U.S. Patent 3,532,179). [PX 1].

FIG. 2

FIG.8

FIG.IO

570

*Appendix B:* Figures 27-29 of the McCreary patent (U.S. Patent 3,532,179). [PX 1].

FIG.27

FIG.28

FIG.27A

FIG.29

Appendix C: Photograph of Jeff-B [DX 222].

Appendix D: Photograph of LCAC. [DX 22O]

Appendix E: Photograph of LCAC. [DX 221].

574

Appendix F: Photograph of LACV-30 [DX 2I6] .

U.S. ARMY LACV-30 LIGHTER, AMPHIBIAN
Air Cushion Vehicle 30-Ton Payload

Bell Aerospace TEXTRON
Division of Textron Inc
Buffalo New York

Appendix G: Photograph of the underside of LACV-30 [DX 217].

Appendix H: Photograph of the underside of LACV-30. [DX 218] .

DEFENDANT'S
EXHIBIT
213

*Appendix I:* Diagram of Jeff-B seal system. [DX 20].

STERN BAG & FINGER
ASSEMBLY DWG NO. 4566745

STERN COMPARTMENTATION
DIAPHRAGM

SIDE BAG (2)
DWG NO. 4566748

TRANSVERSE STABILITY SEAL (2)
DWG NO. 4566751

LONGITUDINAL STABILITY SEAL
DWG NO. 4566749

BOW
COMPARTMENTATION
DIAPHRAGM

BOW
SEAL
PLEAT

FINGER
FEED
HOLES

SIDE COMPART-
MENTATION
DIAPHRAGM

STERN FINGERS
(CLOSED)
DWG NO. 4566746

BOW BAG
DWG NO. 4566742

JOCK STRAP
SEAMS

FINGER
ATTACHMENTS
(TYP)

TRANSVERSE FINGERS
DWG NO. 4566752

BOW AND SIDE
FINGERS OPEN
DWG NO. 4566743

455-94

SEAL SYSTEM

*Appendix J:* Diagram of LCAC bag and finger skirt. [PX 32].

*Appendix K:* Diagram of LCAC bag and finger skirt, underside view. [DX 6].

PERIPHERAL SKIRT

LATERAL STABILITY SEAL

CONE FINGERS

STERN

CONES

LONGITUDINAL STABILITY SEAL

FINGERS

SPRAY SUPPRESSOR

BOW

*Appendix L:* Diagram of LACV-30 trunk system. [DX 3].

STABILITY TRUNKS REAR TRUNKS

KEEL TRUNK

REAR TRUNK CONES

ANTIBOUNCE WEB

ANTIPLOUGH WEB

FINGERS

PERIPHERAL TRUNK